2014 VT 17

# In re L.M., Juvenile

[93 A.3d 553]

No. 13-355

Present: Reiber, C.J., Dooley, Skoglund and Robinson, JJ., and Davenport, Supr. J., Specially Assigned

Opinion Filed February 14, 2014

*Matthew F. Valerio*, Defender General, and *Rebecca Turner*, Appellate Defender, Montpelier, for Appellant.

*William H. Sorrell*, Attorney General, and *Martha E. Csala*, Assistant Attorney General, Montpelier, for Appellee.

¶ 1. **Reiber, C.J.** Father appeals from the trial court's order finding his daughter L.M. to be a child in need of care or supervision (CHINS). He raises numerous arguments. We affirm.

¶ 2. The record indicates the following. L.M. was born in June 2010. On May 31, 2013, the Department for Children and Families (DCF) filed a petition alleging that L.M. was CHINS.[1] The court issued a temporary care order on June 4, 2013, assigning temporary legal custody of L.M. to her paternal grandmother subject to a conditional custody order. Mother later stipulated that L.M. was CHINS due to mother's drug use and homelessness. Father did not agree that L.M. was CHINS, and his attorney indicated that

---

[1] Mother has another minor child by a different father who was also the subject of CHINS proceedings.

he might contest mother's stipulation to the extent that it affected father's situation.

¶ 3. Neither parent attended the September 4, 2013 CHINS merits hearing. Father's mother, who had been caring for L.M. since May 31, 2013, the date the CHINS petition was filed, and a DCF social worker testified at the hearing. The DCF worker said that she first met with parents in March 2013 after DCF received a report about the family. At that time, parents were staying with mother's sister, the sister's boyfriend, and the sister's three children. Parents were sleeping on a couch in the living room. L.M. was sleeping in the top bunk of a bunk bed.

¶ 4. During this March meeting, the social worker reviewed with parents the report that had been made to DCF. She also discussed DCF's history of involvement with the parents and the pattern of homelessness, drug use, transience, and instability as evidenced by prior reports. Parents acknowledged that their behavior fell into a repetitive pattern. Father recounted the family's housing history over the prior two years, explaining that they had been kicked out of or lost two homes, stayed in shelters, been kicked out of a shelter, stayed at father's brother's house temporarily, and eventually ended up in mother's sister's home. Father also described his drug-use history. Father stated that he had been using opiates for the past ten years and that he was currently addicted to opiates. Father said he had been self-medicating with Suboxone he purchased on the street for approximately ten months and that he was on a waiting list for a program that provided Suboxone to opiate addicts.

¶ 5. Following this March conversation, the social worker recommended daycare for L.M. She also strongly recommended that father obtain a substance abuse evaluation so that he could move forward with treatment, including obtaining a Suboxone provider. At that point, father was candid about the family's struggles with drugs and homelessness, and he was open to placing L.M. in daycare and working with DCF. Parents agreed to schedule substance-abuse assessments, and mother agreed to contact someone about obtaining daycare. Father supported the daycare plan.

¶ 6. On May 3, the social worker made an unannounced visit to mother's sister's home based on a report that mother's sister was smoking crack in the basement. Mother's sister was not home when the social worker arrived, but mother showed the social worker the basement. The social worker saw no evidence of crack

use. Mother stated that no one smoked crack in the basement, but acknowledged that the adults sometimes smoked marijuana there. The social worker testified, over father's counsel's objection, that mother later told her that she and father had smoked crack in the basement once.

¶ 7. The social worker told parents during this visit that DCF would be opening a case because parents failed to follow through on any of DCF's recommendations. She explained that DCF's recommendations had been designed to mitigate the family's risk factors and, when DCF's risk assessment tool was applied, the family continued to have a high risk score. Father was angry that a case would be opened. The social worker also informed the parents that a family safety planning meeting would be set up to address the concerns that father had already acknowledged existed and had not been addressed. The social worker informed mother of the date and time of this meeting, and, at mother's direction, she left father a voicemail message with this information. Neither parent appeared at the meeting.

¶ 8. The social worker followed up numerous times with parents between March and May. She located a possible Suboxone provider for father, though services were dependent on father obtaining a substance abuse evaluation. Father did not provide the social worker with a substance abuse assessment by the date that the CHINS petition was filed. He did not enroll L.M. in daycare. He did not obtain stable housing.

¶ 9. At the time the CHINS petition was filed, father and mother were not living together. The social worker testified that L.M. was with mother at the time the petition was filed. As the social worker began to elaborate, father's attorney objected on hearsay grounds. The court overruled the objection, finding mother's statements to the social worker to be nonhearsay as admissions of a party-opponent under Vermont Rule of Evidence 801(d)(2). The social worker then testified that two days before the CHINS petition was filed, mother informed her that she and L.M. were homeless. Mother explained that the family had left mother's sister's home after a fight, and that mother and L.M. had nowhere to go. Mother said that father was staying with his relatives, and those relatives had made it very clear that there was no room for mother or L.M. This evidence was later disputed. Father's mother testified that father told her that L.M. was with him during this period.

¶ 10. The grandmother further stated that father had asked her if L.M. could stay with her given the CHINS petition being filed. She testified that L.M. began living with her either the day the petition was filed or the day after. The grandmother explained that until the day the CHINS petition was filed the parents had asked her to take care of L.M. on many occasions and then changed their minds and decided to keep her themselves.

¶ 11. The grandmother acknowledged father's ongoing struggle with drugs and with obtaining housing. She testified that parents had asked to stay with her but she refused. She explained that she had helped parents before, when mother was pregnant with L.M. and again when she was a year old, but parents always fell into the same pattern — parents made promises but never followed through. The grandmother had also helped parents get set up in an apartment but that also fell through and parents lost everything. Given parents' repeated behavior, the grandmother told parents that she would care for L.M. but she would not take them into her home as well. The grandmother testified that it was not until the court became involved that parents said that L.M. could come and stay with her.

¶ 12. The court found on the record that the State met its burden of proof with respect to a CHINS finding against father. It was undisputed that father had a longstanding serious history of abusing street drugs that he could not bring to a favorable resolution. Father also had a chronic problem with homelessness, and, at the point in question, was unable to care properly for L.M., unable to provide a stable home, and unable to follow through on any recommendations or offers of help from DCF. The court recognized that father's mother had stepped up to care for L.M., but concluded this did not change the fact that grandmother had agreed to help as a matter of family emergency in response to the CHINS petition. It similarly did not change the history of the months leading up to the filing when father, who has a serious drug problem, was simply unable to provide appropriately for L.M.'s care. For these reasons, the court entered a finding of CHINS regarding father, adding that mother had already admitted that L.M. was CHINS for similar reasons. Following the issuance of a written order, this appeal followed.

¶ 13. Father argues on appeal that the court's decision lacks evidentiary support and is contrary to the undisputed evidence. According to father, the State's case rested on inadmissible

hearsay. Father also asserts that the court could not enter a CHINS finding because L.M. was living with her grandmother on the date that the CHINS petition was filed and her needs were being met. Finally, father argues that there was no evidence to show that his drug addiction, chronic instability, and failure to follow through on DCF's recommendations posed a threat to L.M.'s well-being.

¶ 14. We begin with the hearsay issue. Father argues, and the State appears to concede, that the court erred in allowing the DCF social worker to testify to statements that mother allegedly made to her. These included, among other things, mother's statements concerning her own and father's noncompliance with DCF's recommendations; mother's statements that she and father had smoked crack while staying with mother's sister; and mother's statements to the social worker, shortly before the CHINS petition was filed, that she and L.M. were homeless and that father was staying with relatives who had made it very clear that there was no room for mother or L.M.

¶ 15. The State argued below that these statements were nonhearsay under Rule 801(d)(2) as admissions by a party-opponent. Father's attorney disagreed, arguing that mother was no longer an adverse party given that she had stipulated to CHINS. The court agreed with the State that mother remained an adverse party to the State despite her admission to CHINS, and it allowed the testimony.

¶ 16. ██ ██ The court erred in reaching its decision. A statement is considered nonhearsay under Rule 801(d)(2) if:

> The statement is offered against a party and is (A) his own statement, in either his individual or a representative capacity, or (B) a statement of which he has manifested his adoption or belief in its truth, or (C) a statement by a person authorized by him to make a statement concerning the subject . . . .

The statements at issue here plainly were not father's own statements, as required by the rule, nor were they statements that fell within either of the remaining two relevant provisions of the rule. Mother's statements were not being offered against mother as mother had already admitted that L.M. was CHINS due to mother's drug use and homelessness. We find no grounds

for allowing mother's statements to be used against father under Rule 801(d)(2). See *In re Ty.B.*, 878 A.2d 1255, 1261-62 (D.C. 2005) (rejecting notion that mother's out-of-court admissions could be used against father in child neglect proceeding on basis of "privity of obligation," or other grounds); see also *In re Care & Prot. of Sophie*, 865 N.E.2d 789, 796 (Mass. 2007) (in child neglect case, rejecting argument that children's out-of-court statements were admissible against father as admissions of a party opponent as rule of evidence "makes clear that its definition of nonhearsay extends only to the offer of an extrajudicial statement against the declarant" (citing McCormick, Evidence § 262, at 777 (3d ed. 1984) ("If there are several parties on one side of the litigation, whether plaintiffs or defendants, the admission of one of these co-parties is admissible only against himself. It is not admissible merely by virtue of the co-party relationship against the other parties with whom he is aligned."))).

¶ 17.  This conclusion is consistent with the purpose of the rule. See Reporter's Notes, V.R.E. 801 (explaining that "[a]dmissions are treated as nonhearsay because they come in as a by-product of the adversary system," and recognizing that hearsay purpose of cross-examination is satisfied "because the party uttering the statement can scarcely cross-examine himself, although he is free to take the stand to explain the statement"). As one court has explained, the hearsay rule, which "ensure[s] that parties can test all the testimony against them through cross-examination[,] is not relevant when the testimony is the party's own." *In re V.N.W.*, 292 P.3d 548, 554 (Or. 2012) (en banc). Mother's out-of-court statements were inadmissible hearsay under the circumstances of this case, and they should have been excluded.

¶ 18.  Nonetheless, we affirm the court's decision because we find the error harmless. As we have explained, "[t]he erroneous admission of evidence is grounds for reversal only if a substantial right of the party is affected." *In re B.S.*, 163 Vt. 445, 454, 659 A.2d 1137, 1143 (1995). In juvenile cases, where the court has erred in admitting and relying upon certain hearsay evidence, reversal is appropriate "only if the findings of the court, apart from the findings based on the improper evidence, d[o] not support the court's conclusions." *Id.* (citing *In re M.B.*, 158 Vt. 63, 69-70, 605 A.2d 515, 518-19 (1992) (no reversible error where trial

court's conclusion based on testimony properly in evidence)); see also *In re D.D.*, 2013 VT 79, ¶ 34, 194 Vt. 508, 82 A.3d 1143 (reiterating that in juvenile proceedings, court's decision will not be reversed, even if some of trial court's findings are unsupported, "if the remainder of the court's findings, which are supported by the record, are sufficient to sustain the decision" (quotation and brackets omitted)). We reject father's suggestion that the State's case rested entirely on hearsay; indeed, there does not appear to be any specific finding in this case based on the hearsay evidence in question. In any event, there is sufficient admissible evidence to support the court's findings, and the court's findings support its conclusion that L.M. is CHINS. See *In re D.D.*, 2013 VT 79, ¶ 34 (reciting that on review Supreme Court will "uphold the court's factual findings unless clearly erroneous and the court's legal conclusions when supported by those findings").

¶ 19. ■ As relevant here, a child is "in need of care or supervision" when he or she "is without proper parental care or subsistence, education, medical, or other care necessary for his or her well-being." 33 V.S.A. § 5102(3)(B). The State has the burden of establishing by a preponderance of the evidence that a child is CHINS. *Id.* § 5315(a); see also *id.* § 5315(f), (g) (trial court must determine if allegations in CHINS petition have been established). We apply the preponderance standard of proof in CHINS cases, rather than the more stringent "clear and convincing evidence" standard applicable in termination of parental rights cases, because this standard strikes an appropriate balance between the State's interest in "ensuring the 'safety and welfare of the child'" and the parents' interest "in 'maintaining family integrity.'" *In re M.L.*, 2010 VT 5, ¶ 7, 187 Vt. 291, 993 A.2d 400 (quotation omitted). This standard is particularly appropriate given that "parents' rights are at most temporarily curtailed in a CHINS proceeding." *Id.*

¶ 20. ■ We stated broadly in *In re D.T.* that "[t]he issue before the family court at the merits stage of a CHINS proceeding is a determination of whether, at the time of the filing of the petition, the juvenile is a child in need of care and supervision." 170 Vt. 148, 156, 743 A.2d 1077, 1084 (1999); see *In re R.L.*, 148 Vt. 223, 227, 531 A.2d 909, 911 (1987) ("The issue for determination at the merits hearing is whether the State can prove the allegations in the petition that a child is in need of care and

supervision." (quotation omitted).[2] This does not mean that the court's analysis is limited only to the child's well-being on the precise day that the CHINS petition was filed. Obviously, the circumstances leading up to the filing of the CHINS petition are relevant in the court's assessment. This allows the court to have a full picture of the child's well-being and to base its decision on all relevant information; it promotes the care and protection of the child, while not unfairly undermining parents' interest in maintaining family integrity. See 33 V.S.A. § 5101(a)(1) (indicating that juvenile statutes must be construed, among other things, to provide for care and protection of children coming within its provisions, and to preserve family if appropriate).

¶ 21. ■ As indicated above, father contends that L.M. cannot be CHINS because she was living with her grandmother at the time the CHINS petition was filed. While we have recognized that a court is not *compelled* to enter a CHINS finding whenever a child is being cared for by persons other than a parent or legal guardian, see *In re G.C.*, 170 Vt. 329, 334, 749 A.2d 28, 31 (2000), we have never suggested that a child *cannot* be CHINS, as a matter of law, under such circumstances. See *id.* at 334, 749 A.2d at 32 (upholding CHINS determination despite fact that child was being cared for in foster-care arrangement created by mother). Instead, "the issue is whether, given all of the circumstances, the child is without proper 'parental' care, such that the child's well-being is threatened." *Id.* This is a question of fact, and "each case must be determined on its own facts." *Id.* (quotation omitted).

¶ 22. ■ In this case, the court recognized that father had arranged for his mother to care for L.M., apparently on the day that the CHINS petition was filed or the day after. As the court made clear, however, this did not change the underlying and undisputed facts in this case. It was undisputed that father had a longstanding, continuing, and serious addiction to street drugs that he had not been able to resolve. Father also had a chronic problem with homelessness. He did not follow any of DCF's recommendations, which were designed to reduce the risk of harm to L.M. He did not secure stable housing. Even in the face of an

---

[2] The issue at the disposition hearing, by contrast, is where to place a child found to be CHINS, and "the determination of parental unfitness, which triggers the transfer of custody away from the parents, must be made at the disposition hearing." *In re R.L.*, 148 Vt. at 227, 531 A.2d at 911.

acknowledged ten-year history of opiate addiction and a need for treatment, he did not obtain a substance-abuse evaluation while committing to obtain the same. Such an assessment would have allowed him to move forward with treatment. He did not follow through with the social worker's recommendations regarding daycare for L.M. even though he voiced his support of that recommendation from the first meeting and the social worker afterwards provided the name of a daycare with an opening. The lack of follow through permeates the merits hearing record of father's story. The grandmother testified the reason she refused to let father, and mother, live with her is because of their failure to keep their promises. As discussed in additional detail below, the court's findings, which are based on admissible evidence, support the court's CHINS determination.

¶ 23. Our decision in *In re G.C.* does not compel a contrary conclusion. In that case, a mother who suffered from chronic mental illness arranged for a foster family to help her care for her infant son. The mother created this arrangement while she was pregnant, with the help of her mental health providers. Shortly after G.C. was born, the mother attempted suicide. G.C. was subsequently adjudicated CHINS. Mother argued in part that the family court erred in adjudicating the child CHINS because he had proper "parental care" through the foster care arrangement. 170 Vt. at 333, 749 A.2d at 31.

¶ 24. In considering this argument, we recognized that mother had a carefully planned arrangement for G.C.'s care, and that the arrangement had been made with the understanding that, given mother's past psychiatric history, mother might be hospitalized or otherwise incapacitated at times, and that during such periods, the foster family would assume full-time care of G.C. Nonetheless, we concluded that the record supported the family court's CHINS adjudication based on a variety of factors, including the mother's inability to care for herself, let alone a child, without substantial support, as well as the fact that the foster couple did not have legal guardianship over G.C. and thus could not stop mother from leaving the foster home with the child if she chose to do so. *Id.* at 334-35, 749 A.2d at 32. "While there was no evidence that the foster-care arrangement had failed to provide G.C. support at the time the infant was removed from the foster family's home," we found that the family court had "correctly focused on the likelihood of prospective harm to the child." *Id.* at 335, 749 A.2d at 32

(quotation omitted). In light of the mother's psychiatric history, we concluded that "the danger of harm to G.C. was substantial enough for the State to intervene and examine the situation while protecting G.C. from any potential harm." *Id.* at 335, 749 A.2d at 33.

¶ 25. Unlike the mother in *In re G.C.*, father did not have a carefully planned arrangement with his mother to care for L.M. during a temporary period of incapacitation. Rather, the evidence showed that parents "bounced back and forth" in their desire to have grandmother care for the child with the ultimate decision being made contemporaneously with the filing of the CHINS petition. Father's drug abuse and homelessness are longstanding chronic problems, moreover, not temporary ones. Additionally, under father's arrangement with his mother, he could remove the child from her care at any time. Under the circumstances of this case, the court could reasonably conclude that L.M. was "without proper parental care . . . or other care necessary for his or her well-being," 33 V.S.A. § 5102(3)(B), notwithstanding father's last minute placement of the child with his mother. *In re A.F.*, 160 Vt. 175, 178, 624 A.2d 867, 869 (1993) ("We leave it to the sound discretion of the family court to determine the credibility of the witnesses and to weigh the evidence.").

¶ 26. Father next challenges the evidentiary basis for several of the court's findings. Specifically, father asserts that the court committed clear error in finding that he has a chronic homelessness problem. He also contends that the court relied on inadmissible hearsay testimony to find that he failed to follow through on any of DCF's recommendations. Assuming these arguments fail, father asserts that the court did not find, and the record does not establish, how his drug addiction, unstable lifestyle, and failure to follow though with any of DCF's recommendations pose a threat to L.M.'s well-being.

¶ 27. ■ We begin with father's evidentiary challenges, both of which we reject. As set forth above, the social worker testified to father's housing history and father's mother similarly recounted father's ongoing struggle with addiction, the lack of commitment to treatment, and lack of stable housing. The evidence showed that over the course of several years the family had been evicted from two homes, stayed in shelters, been evicted from a shelter, stayed at father's brother's house temporarily, and eventually

ended up in mother's sister's home. In a similar vein, father's mother testified that she had twice allowed parents to stay with her, but she refused to continue providing them shelter given their repeated failure to follow through on promises they made. Indeed, at the initial meeting with the social worker in March, father admitted to a repeating pattern of drug abuse and homelessness. The evidence supports the court's finding that father chronically lacked a stable home.

¶ 28. ▇ The court's finding that father was unable to follow though on any of DCF's recommendations or offers of help is similarly supported by admissible evidence. The social worker testified that by the time the CHINS petition was filed she had not received a substance-abuse assessment from father, father had not obtained stable housing, and L.M. was not enrolled in daycare. The social worker also described how she had lined up a potential Suboxone provider for father, but father failed to take advantage of this opportunity.

¶ 29. ▇ ▇ The facts found by the court — father's longstanding and continued drug addiction, his lack of stable housing, and his failure to follow through — are sufficient to support its conclusion that L.M. was CHINS.[3] The State did not need to establish actual harm. See *E.J.R. v. Young*, 162 Vt. 219, 223, 686 A.2d 1284, 1286 (1994) (explaining that "[a]ctual and completed harmful acts cannot be, and are not, a precondition to a CHINS finding"). We note that mother stipulated that L.M. was in need of care or supervision based on similar factors. See *In re C.P.*, 2012 VT 100, ¶ 28, 193 Vt. 29, 71 A.3d 1142 (explaining that "[t]he focus of a CHINS proceeding is the welfare of the child, and therefore a court may adjudicate the child as CHINS even if the allegations are established as to one parent but not the other"). We reject father's contention that the court found L.M. to be CHINS simply because parents are poor.

---

[3] In reaching our decision, we do not rely on statutory definitions in 33 V.S.A. § 4912, which concern the child protection registry, or on administrative rules that similarly concern the registry process. "[W]e have expressly recognized that the statutes governing the registry process, found in chapter 49 of Title 33, have legislative goals, functions, and procedures completely different from those governing juvenile proceedings in family court." *In re M.E.*, 2010 VT 105, ¶ 13, 189 Vt. 114, 15 A.3d 112 (quotation omitted).

¶ 30. ▪ ▪ In reaching its decision that L.M. was "without proper parental care or subsistence, education, medical, or other care necessary for his or her well-being," 33 V.S.A. § 5102(3)(B), the court could properly "draw upon its own common sense and experience." *Payrits v. Payrits*, 171 Vt. 50, 53, 757 A.2d 469, 472 (2000). We have observed that "[t]he adverse impacts upon a child resulting from the drug addiction of the child's care-giver hardly needs explanation." *In re B.C.*, 169 Vt. 1, 14, 726 A.2d 45, 54 (1999). Father contends, by contrast, that a parent's drug use does not necessarily have any effect on a child's well-being, citing out-of-state cases to this effect. The undisputed facts in this case, however, show that father has been addicted to opiates for ten years, that he is self-medicating, and that he is unable to take advantage of offers of assistance concerning his drug addiction. Mother is also addicted to drugs, and she has conceded that her drug use renders her incapable of caring appropriately for L.M. See *Young*, 162 Vt. at 222-23, 686 A.2d at 1286 ("[T]he central concern in CHINS proceedings is the ability of the parents to render appropriate and necessary care for the child's well-being."). It was reasonable for the court to conclude that father's opiate addiction poses a risk of harm to a toddler's well-being, including having a negative impact on father's ability to provide adequate supervision.

¶ 31. While father's unstable living situation, standing alone, might not be sufficient to support a CHINS determination, it adds another element of risk under the facts of this case, raising the prospect, given father's repetitive pattern of haphazard moves, that father and L.M. could end up in an unsafe living situation. Father's inability to follow through on DCF's recommendations — recommendations designed to promote L.M.'s safety — similarly enhances the potential risk of harm to L.M.'s well-being. Given all of these factors, including mother's concession, we conclude that the record supports the court's decision that there was a risk of prospective harm to the child sufficient to justify the State's temporary intervention to ensure that L.M. is safe.

¶ 32. Thus, we reject father's assertion that the CHINS adjudication must be vacated and the CHINS petition dismissed.

*Affirmed.*

¶ 33. **Robinson, J.,** dissenting. The State's authority to interfere with the parent-child relationship in the name of protecting

children is "awesome," and is accordingly subject to rigorous statutory and constitutional restraints. *In re N.H.*, 135 Vt. 230, 235-37, 373 A.2d 851, 855-57 (1977). "Accordingly, any time the State seeks to interfere with the rights of parents on the generalized assumption that the children are in need of care and supervision, it must first produce sufficient evidence to demonstrate that the statutory directives allowing such intervention are fully satisfied." *Id.* at 235, 373 A.2d at 855. I cannot agree that the admissible evidence produced by the State at the merits hearing meets this rigorous standard.

¶ 34. Only two witnesses testified at the hearing: the social worker and father's mother. The social worker and father's mother both provided testimony based on their own observations, and both testified about statements that father had made to them. The social worker also testified about statements mother made in conversations the social worker had with mother. The majority acknowledges that admission of the social worker's testimony concerning mother's out-of-court statements was error.

¶ 35. That leaves two main categories of evidence that might support a CHINS finding. First, the State presented evidence that father had a longstanding, untreated opiate addiction problem. In particular, the State presented evidence of father's own admissions to the social worker that he had been on opiates since he was sixteen, that he has a current opiate addiction, that he has been self-medicating with Suboxone for eight to ten months, and that he is on a waitlist for a Suboxone program in Burlington. The social worker further testified that she recommended treatment options to father, and she urged him to undergo a substance-abuse evaluation. She testified that he did not provide her with a report of a substance-abuse evaluation prior to the State's filing of a CHINS petition despite her strong recommendation.

¶ 36. Second, the State presented evidence that father, mother and the child have struggled with housing. The social worker testified that in her meeting with father and mother father acknowledged his challenges with housing. In particular, the social worker testified:

> And [father] provided a fair amount of information and explained, you know, this is why we were homeless this year; this is what happened next. So he sort of provided the sequence of events over the past, I don't know, maybe

two years or so that then resulted in them residing at [mother's sister's]. So we talked about being kicked out of, or losing two housing — two homes, ending out in shelters, getting kicked out of a COTS shelter most recently, and staying at his brother's temporarily, in (indiscernible), and winding up in (indiscernible), in [mother's sister's] home.

The social worker further testified that both father and mother acknowledged that the lack of housing was a "repetitive pattern." Father's mother likewise described father's and mother's serial housing arrangements.

¶ 37. For the most part, that is the foundation upon which the CHINS finding rests. The above recitations are not abbreviated summaries of the evidence presented in support of the State's CHINS petition; they *are* the evidence. The question is whether, absent more, that evidence is sufficient to support a finding that the child is "without proper parental care or subsistence, education, medical, or other care necessary for his or her well-being." 33 V.S.A. § 5102(3)(B).

¶ 38. I recognize the trial court's difficult position. On the one hand, a court cannot and should not check its common sense, and its experience of the real world, at the courthouse door. I have no doubt that parental opiate addiction and housing instability are two factors very frequently associated with children who are without proper parental care necessary for their well-being. Where parents have no stable place to live, I can well imagine they may find themselves caring for their children in unsuitable or even dangerous environments. Multiple moves can be disruptive to their children's community activities, schooling, or relationships. And an active opiate addiction can cloud even the most caring and thoughtful parent's judgment and capacity to properly care for his or her child.

¶ 39. On the other hand, if the State is to take the awesome step of interposing itself into the parent-child relationship, it cannot rely on broad generalizations or per se rules; it must have some individualized evidence that a child is without proper parental care necessary for the child's well-being. In this case, we know that the parents struggled to find stable housing. But there is no evidence in the record that, as a result of this struggle, the child ever resided in unsafe, unsuitable or unhealthy housing. The

evidence was that the family lived with mother's sister during the most recent period of DCF engagement, and that L.M. moved in with her paternal grandparents around the time of the CHINS petition. There is no evidence in the record that either home was unsafe or unsuitable for the child's well-being. Nor was there evidence that the child lived in an unsafe or unsuitable setting prior to DCF's most recent engagement.[4]

¶ 40. Moreover, the fact of sleeping under multiple different roofs over a two-year period does not by itself support a finding that a child is without proper parental care; parents that move frequently due to their work are not per se unable to properly care for their children. And in this case, there is no evidence of harm or risk of harm to the nearly three-year-old child because she slept under several different roofs during a two-year period. If important activities or relationships, or the child's sense of security and well-being were disrupted by the moves, the evidence does not reflect that.

¶ 41. Finally, father's untreated longstanding opiate addiction is undoubtedly a red flag. But without more, I cannot tell whether and how it put the child at risk. The social worker testified that father claimed to be self-medicating with Suboxone while waiting to get into treatment, and that he did not provide her evidence of a substance abuse evaluation during the course of her involvement with the family. This is the most concerning constellation of evidence, and is the reason why this is a very close case. But it cannot be that the child of every parent with an admitted opiate addiction is presumed CHINS without any individualized showing. See, e.g., *B.C. v. Dep't of Children & Families*, 846 So. 2d 1273, 1275 (Fla. Dist. Ct. App. 2003) (reversing adjudication of dependency on basis of father's drug and alcohol abuse where there was "no testimony that the father failed to meet the child's needs while the child was in his care, no testimony that physical harm had come to the child while in the father's care, and no testimony that the child had been emotionally or mentally harmed by his father's drinking and drug abuse").

---

[4] The most that can be inferred from the record is that at some unspecified time or times in the past the parents and child spent time in a homeless shelter. But there is no evidence as to the condition of the shelter, the amount of time the child spent there, or how long prior to the CHINS petition the family spent time in a shelter.

¶ 42. In this case, there is no evidence that father was failing to meet his own or the child's day-to-day needs on account of his admitted addiction, and no evidence that he placed the child in unsafe or unhealthy situations or failed to properly supervise her. There is not even any evidence as to what steps, if any, he did take to undergo an evaluation, or why he did not. The only evidence as to father's current status was that he was self-medicating with Suboxone — a drug used in treatment for opiate addictions. There is no evidence as to whether his self-treatment regimen was enabling him to meet his responsibilities. Had the State subpoenaed mother or some other competent witness, it might well have elicited testimony not only that father had a generalized problem with opiates, but that he was engaging in conduct that put the child at risk — whether that be caring for the child while under the influence, leaving the child with someone, perhaps mother, who was not able to care for the child, or otherwise failing to meet the child's needs.

¶ 43. I am not suggesting that a child is not CHINS until the child has actually suffered harm. Nor am I suggesting that the State needs to provide expert testimony in every case about the effect of opiate addiction on a parent's ability to care for a child. But I do believe that an individualized assessment of the risk of harm facing a child is required; blanket generalizations about opiate addiction and housing instability are not enough to support a CHINS finding. Although the State argues that the record here reflects much more than that, I do not believe the evidence supports this claim.

¶ 44. The State also points to the parents' failure to enroll the child in daycare, as recommended by DCF, as a factor supporting the CHINS finding. There is no evidence in this case that the child was not cared for during the day, or that outside daycare was necessary to protect the child's well-being. A DCF recommendation that the parents enroll the child in daycare does not convert outside daycare into an essential component of parental care, or the absence of outside daycare into evidence of CHINS. Although DCF is free to recommend strategies to struggling parents, and to consider whether parents comply with its recommendations as factors guiding DCF's own decisionmaking, a parent's failure to follow DCF's recommendation is not itself evidence of a child lacking proper parental care. A parent's failure to follow DCF's recommendation may be important evidence that

a parent has forgone the opportunity to address an *underlying problem* or risk of harm, but it is that problem or risk of harm that supports a CHINS finding, not the failure to follow DCF's recommendation in and of itself. Absent evidence that this child was not cared for during the day, or that the child had some particular need that could be addressed in outside daycare, the parents' failure to enroll their two-year-old child in daycare is not a factor that supports a CHINS finding.

¶ 45. The Legislature and this Court have consistently recognized the primacy of the parent-child relationship, and the limitations on State authority to intervene in that relationship. See 33 V.S.A. § 5101(a)(3) (statute should be construed to "preserve the family and to separate a child from his or her parents only when necessary to protect the child from serious harm or in the interests of public safety"); *In re N.H.*, 135 Vt. at 236, 373 A.2d at 856 (recognizing that "the freedom of children and parents to relate to one another in the context of the family, free of governmental interference, is a basic liberty long established in our constitutional law" (citing *Stanley v. Illinois*, 405 U.S. 645 (1972); *Prince v. Massachusetts*, 321 U.S. 158 (1944); *Meyer v. Nebraska*, 262 U.S. 390 (1923))). This may well be a case in which, armed with complete information, I would agree that the child in question was CHINS. But the evidence actually admitted into the record at the hearing below does not get me there. Augmenting the record evidence with broad-brush presumptions or assumptions without individualized evidence of harm or risk of harm to the child in this case violates the rigorous statutory and constitutional limitations on the authority of the State in this realm. For these reasons, I respectfully dissent.

¶ 46. I am authorized to state that Justice Skoglund joins this dissent.