NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 9

No. 2015-273

| | |
|---|---|
| In re J.C. & T.F., Juveniles | Supreme Court |
| | On Appeal from<br>Superior Court, Franklin Unit,<br>Family Division |
| | December Term, 2015 |

Alison S. Arms, J.

Matthew Valerio, Defender General, and Joshua S. O'Hara, Appellate Defender, Montpelier, for Appellant Mother.

William H. Sorrell, Attorney General, and Martha E. Csala, Assistant Attorney General, Montpelier, for Appellee Department for Children and Families.

Michael Rose, St. Albans, for Appellee Juveniles.

PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.

¶ 1. **REIBER, C.J.** Mother appeals from a superior court order adjudicating the minors J.C. and T.F. to be children in need of care and supervision (CHINS). Mother contends that the evidence and findings fail to support the judgment, and that the court's findings were conclusory and inadequate. We affirm.

¶ 2. This proceeding commenced with the filing of CHINS petitions in June 2014, based on reports and observations of social-service providers concerning mother's care of the

children during the preceding six months. At the time, mother was living with her child, J.C., who was almost five years old, her husband and their daughter, T.F., who was almost two years old, and her husband's daughter K.P., who was then six years old. K.P. is the subject of a separate CHINS proceeding. The trial court held a merits hearing as to J.C. and T.F. in May 2015, and issued a written ruling in July 2015.

¶ 3. The facts may be summarized as follows. An in-home service provider with the Early Head Start program who visited the family on several occasions in May 2014 observed a number of cruel and abusive interactions between mother and her stepdaughter K.P. Mother told K.P. that "she didn't want her anymore," informed the Head Start provider that she wanted to paddle K.P. "until she bled," admitted that she had not given K.P. anything to drink for two days to teach her a lesson for "stealing food from the refrigerator," reported that she had made K.P. stand in a corner for hours, and stated that she "want[ed] to be the next one on T.V. for killing her kid K.P."

¶ 4. Based on the Head Start provider's report, a social worker with the Department for Children and Families also visited the home. She observed that mother appeared to be stressed, overwhelmed, and agitated throughout the visits, noted similarly cruel treatment of K.P., and also observed an incident in which mother grabbed J.C. by the arms and forced the child onto a couch. Mother testified that she regularly suffered from depression, and had been prescribed medication but was not taking it. Father testified about his own extensive history of drug abuse and struggles to stay clean and sober. Although his work kept him away from the home for much of the time, he testified that he had no concerns about mother's treatment of the children.

¶ 5.    The court concluded that mother had emotionally and physically abused K.P., and further concluded that the evidence demonstrated mother's general inability to properly care for J.C. and T.F. and her need for parenting education.  The court noted father's need for continued substance abuse treatment.  Based on these conclusions, the court adjudicated both children to be CHINS, and set the matter for a disposition hearing.  This appeal by mother followed.

¶ 6.    When reviewing a CHINS adjudication, we will "uphold the court's factual findings unless clearly erroneous and the court's legal conclusions when supported by those findings."  In re D.D., 2013 VT 79, ¶ 34, 194 Vt. 508, 82 A.3d 1143.

¶ 7.    A child is "in need of care or supervision" when, among other possible situations, he or she is "without proper parental care or subsistence, education, medical, or other care necessary for his or her well-being."  33 V.S.A. § 5102(3)(B).  As we have explained, "[t]he focus of a CHINS proceeding is the welfare of the child, and therefore a court may adjudicate the child as CHINS even if the allegations are established as to one parent but not the other."  In re C.P., 2012 VT 100, ¶ 28, 193 Vt. 29, 71 A.3d 1142.  The principal issue "is whether, given all of the circumstances, the child is without proper 'parental' care, such that the child's well-being is threatened," a "question of fact, . . . and each case must be determined on its own facts."  In re G.C., 170 Vt. 329, 334, 749 A.2d 28, 32 (2000) (quotation omitted).  Because the critical focus in a CHINS proceeding is on the child's well-being, the State is not required to demonstrate that the child has suffered actual harm, but rather is subject to a risk of harm.  See In re L.M., 2014 VT 17, ¶ 29, 195 Vt. 637, 43 A.3d 553 (noting that State did not "need to establish actual harm" to show that child was CHINS); see also E.J.R. v. Young, 162 Vt. 219, 223, 646 A.2d 1284, 1287 (1994) (explaining that "[a]ctual and completed harmful acts cannot be, and are not, a precondition to a CHINS finding").  It is equally well settled that "[t]he family court may rely on

evidence of the treatment of a sibling in concluding that a child is a CHINS." Young, 162 Vt. at 224, 646 A.2d at 1287; see also In re J.J.P., 168 Vt. 143, 148, 719 A.2d 394, 397 (1998) ("The court may rely on evidence of a parent's treatment of siblings to show a pattern of abuse and neglect, and a general inability to protect the children from harm.").

¶ 8. Mother concedes that evidence of a parent's treatment of a sibling may be relevant in deciding whether a child is CHINS. She contends, however, that such treatment "is not alone conclusive" and that the trial court here erred "when it concluded that treatment of a sibling alone, without any connection to the children subject to the CHINS petition, was sufficient to conclude those children are CHINS."

¶ 9. The record does not support mother's characterization of the court's ruling or the evidentiary basis of its decision. As noted, the trial court concluded that mother's cruel treatment of K.P. "also endanger[ed] the health and welfare of J.C. and T.F." This conclusion found support in the testimony of the family's DCF social worker, who testified at length about her observations of mother at home with all three children. The social worker observed that mother was generally "stressed out [and] overwhelmed"; that the apartment was "chaotic"; and that mother's demeanor throughout the visit was "very agitated." Although mother's blatant and vicious cruelty was directed at K.P., the social worker also observed an incident in which mother, while "extremely stressed," grabbed J.C.'s arms and pushed the child onto a couch with such force that the social worker "voiced to [mother] my concern for the way that she was handling her own daughter." The social worker also recalled that, "[w]ith all three children . . . [mother] was very agitated," and that mother readily acknowledged feeling verwhelmed by her circumstances.

4

¶ 10. In addition, a DCF investigator who visited the home several months before the filing of the CHINS petition recalled that mother had complained of J.C.'s "behavioral difficulties" and had admitted her "struggles to manage J.C.'s behaviors." In her own testimony, mother acknowledged that she "struggle[d] with depression," had difficulty finding counselors she "mesh[ed]" with, and went through periods where she "tend[ed] to fade away."

¶ 11. The record thus does not support mother's claim that the trial court relied solely on her treatment of K.P. in concluding that J.C. and T.F. were at risk. On the contrary, the record shows that mother's cruelty occurred in circumstances where all three children were present and where—according to several disinterested witnesses—she exhibited a high level of stress and agitation which manifested itself in a least one instance of physical aggression toward J.C. that caused concern and comment by the family's DCF social worker. This was sufficient to support the court's conclusion that her general conduct endangered the health and welfare of J.C. and T.F.

¶ 12. Mother also makes much of the court's findings that she "singled out K.P. for disparate treatment" and was observed to "treat K.P. differently than the other children." Mother maintains that these findings betray a "logical inconsistency" with the court's subsequent conclusion that her behavior posed a risk to the other children. The argument is unpersuasive. The risk to J.C. and T.F. was plainly predicated on the agitated and unstable environment in which K.P.'s abuse occurred; finding that mother singled-out K.P. for particular abuse is not inconsistent with that determination.

¶ 13. Finally, mother asserts that the court's findings are sparse and conclusory and fail to adequately explain the reasoning underlying its decision. CHINS orders must set forth findings sufficient to support a conclusion that the child is in need or care or supervision. In re

5

M.C.P., 153 Vt. 275, 291, 571 A.2d 627, 636 (1989). The court's specific findings as to J.C. and T.F. are indeed truncated, and its analysis would have been far stronger if it had cited the facts set forth earlier in its ruling to support its ultimate conclusion that the children were CHINS. We are satisfied, however, that the decision provides a minimally sufficient basis to understand the court's reasoning, and to support its conclusion that the children were in need of care or supervision.

Affirmed.

FOR THE COURT:

_____
Chief Justice

¶ 14.   **ROBINSON, J., dissenting.** I don't disagree with the majority's characterization of the applicable law in this case, but do disagree with the majority's holding that the trial court's findings support its conclusion that J.C. and T.F. were CHINS. I would remand to the trial court for further findings.

¶ 15.   The applicable law is uncontroversial: it requires a distinct determination that a child is without proper parental care with respect to each child subject to a CHINS petition, but does not necessarily require a finding that the child has suffered actual harm; and it allows but does not require a factfinder, in appropriate circumstances, to infer that a parent's conduct toward one child reflects a risk to the other.

¶ 16.   With respect to the first point, this Court has explained, "the focus of a CHINS proceeding is the welfare of the child." In re B.R., 2014 VT 37, ¶ 13, 196 Vt. 304, 97 A.3d 867 (quotation omitted). Accordingly, the family division should focus on the child's welfare rather than on the respective unfitness of each parent. Id. ¶ 14; see also 33 V.S.A. § 5315(a) ("At a

6

hearing on the merits of a petition, the State shall have the burden of establishing by a preponderance of the evidence that <u>the child</u> is in need of care and supervision." (emphasis added)). Moreover, the question before the court is "whether, given all of the circumstances, the child is without proper parental care, such that the child's well-being is threatened." <u>In re G.C.</u>, 170 Vt. 329, 334, 749 A.2d 28, 32 (2000) (internal quotations omitted). Actual harm is not a prerequisite to a CHINS finding. <u>In re L.M.</u>, 2014 VT 17, ¶ 29, 195 Vt. 637, 93 A.3d 553.

¶ 17. Concerning the second point, this Court has explained that " '[w]hether treatment of one child is probative of neglect or abuse of a sibling must be determined on the basis of the facts of each case.' " <u>E.J.R. v. Young</u>, 162 Vt. 219, 224, 646 A.2d 1284, 1287 (1994) (quoting <u>In re D.P.</u>, 147 Vt. 26, 30, 510 A.2d 967, 970 (1986)). Where evidence reflects "a pattern of abuse and neglect, and a general inability of [a parent] to protect" any of the children, the family division "may rely on evidence of the treatment of a sibling in concluding that a child is a CHINS." <u>Young</u>, 162 Vt. at 224, 646 A.2d at 1287. In <u>Young</u>, this Court considered a neglect petition concerning a newborn child whose four older siblings had been the subject of hearings to terminate parental rights that concluded a month before the newborn's birth. <u>Id</u>. at 220, 646 A.2d at 1285. Based on evidence that the parents "exhibited a pattern of conduct toward children entrusted to their care substantially departing from the norm," this Court concluded that "there was more than sufficient evidence strongly linking the treatment of J.R.'s siblings to her own likely future treatment, justifying the order that she is a CHINS." <u>Id</u>. at 225, 646 A.2d at 1287 (quotation omitted).

¶ 18. On the other hand, where evidence that supports a CHINS determination with respect to one child is not probative of the risk of harm to another, that evidence may not support a CHINS determination as to the second child. See, e.g., <u>In re J.M.</u>, 131 Vt. 604, 608-09, 313

A.2d 30, 32-33 (1973). In J.M., the trial court considered five neglect petitions relating to a set of siblings. The court's neglect determinations concerning the four older children were not appealed. The evidence reflected generally that the children lived in an overcrowded and untidy home. The trial court's findings concerning the cleanliness of the children were supported by evidence relating to the four older children while attending school. This Court held that that evidence could not support a finding that the six-month old child was neglected. Id. at 608-09, 313 A.2d at 32-33. While evidence of a parent's conduct toward one sibling may support an inference about the risk faced by another sibling, that inference is not automatic. The evidence in a particular case must support the inference that the parent's conduct toward one child reflects or gives rise to a threat of harm to the other. See also In re M.K., 2015 VT 8, ¶ 6, __ Vt. __, 114 A.3d 107 (noting that trial court found that mother's abusive action toward one child "stemmed from her frustration at not being able to control a rowdy five-year old," and that "at this stage of his life, the younger child was not at immediate risk of being subjected to the same kind of conduct").

¶ 19.    Applying these principles to the trial court's findings, I cannot agree that those findings support the conclusion that J.C. and T.F. are CHINS. The trial court's findings concerning mother's horrific treatment of K.P. emphasize K.P.'s unique position in the household, and fail to provide a bridge from mother's treatment of K.P. to the risks faced by the other children. Nor can I join in the majority's reframing of the trial court's decision.

¶ 20.    The trial court's findings paint a picture of a vulnerable and unwelcome step-child who is singled out for shocking mistreatment by mother. The trial court found the following. A witness from the Department for Children and Families described mother admitting to putting a backpack on K.P., telling K.P. that she was not welcome any more, and leaving her in the

8

hallway outside the apartment for an hour; that she had not given K.P. a drink in two days because the child needed to learn a lesson because the child had been getting up in the middle of the night to "steal food" from the refrigerator; that K.P. was no longer allowed to have a bed in her room because she was deliberately urinating and defecating on the bed; and that K.P. was required to sit on the floor rather than the furniture, while the other children were allowed to sit on the furniture. The witness saw mother "single[] out [K.P.] for disparate treatment" by requiring K.P. to stand in the corner for pretending to be a cat even though J.C., who was playing with her, was not punished. Finally, the witness reported that mother stated that she wanted to put K.P. on the street, wanted to let DCF take her, and "<u>wanted</u> to be the next one on T.V. for killing a kid."

¶ 21. A different social worker testified about mother's reports of stress with K.P. Mother said that she did not want K.P., but that the child "came with the marriage." Mother described K.P. as an odd child who did not act like a normal child, who ate more food than they could afford to feed her, and who, as a result of toileting issues, required pull-ups that they could not afford. That social worker also saw mother "treat K.P. differently than the other children" during the social worker's visit to the home.

¶ 22. On the basis of these findings, the trial court concluded that mother's treatment of K.P. supported a CHINS finding as to J.C. and T.F. In particular, the court found that K.P. suffered emotional and physical abuse at the hands of mother. The court elaborated, explaining that the child came to the home suffering symptoms relating to possible prior trauma, mother was overwhelmed by K.P.s behavior and ill-equipped to address her needs, mother resented having to care for K.P., and mother stigmatized the child within the family. The court then addressed the critical question in <u>this</u> case involving J.C. and T.F.:

9

The issue is whether [mother's] disparate and cruel treatment of K.P. also renders her biological children, J.C. and T.F., children in need of care and supervision. The Court finds that it does. Further, [mother's] treatment of K.P., and her insensitivity and callous disregard for K.P.'s well-being speak to the general need for parenting education.

¶ 23. Ordinarily, the leap from a parent's gross mistreatment of one child to the risk of harm faced by another would not be particularly great, especially where the evidence reflects "a pattern of abuse and neglect, and a general inability of [a parent] to protect" any of the children. Young, 162 Vt. at 224, 646 A.2d at 1287. But in this case, the repeated emphasis in the findings on K.P.'s unique position—she was a stepchild with significant behavioral challenges who was intensely unwanted by mother—and on the fact that mother singled out K.P. for disparate treatment relative to J.C. and T.F., undermines the inference that mother's abuse of K.P. reflects a broader pattern that signals a risk of abuse for J.C. and T.F. Under these circumstances, the trial court's findings do not connect the dots between mother's cruel treatment of K.P. and its CHINS determinations with respect to the other children. See In re M.B., 147 Vt. 41, 45, 509 A.2d 1014, 1017 (1986) ("It is crucial that findings indicate to the parties and to this court, if an appeal is taken, what was decided and how the decision was reached."); see also In re J.M. 172 Vt. at 69, 769 A.2d at 663 (holding conclusory statement not "adequate to explain the how the court weighed the evidence and reached the conclusion it did").

¶ 24. The majority addresses the limitations of the trial court's findings by reshaping its rationale. It characterizes the trial court's decision as resting on the "agitated and unstable environment in which K.P.'s abuse occurred." Ante, ¶ 12. It points to the evidence that mother's cruelty occurred in some circumstances in which all three children were present and in which mother "exhibited a high level of stress and agitation."

10

¶ 25. I reject the majority's approach for two reasons. First, the majority is reframing the trial court's findings and interposing its own assessment of the record. The trial court's findings focus almost entirely on mother's mistreatment of K.P., who was not the subject of the CHINS petitions before the court. The court specifically posed the question of whether mother's disparate and cruel treatment of K.P. also renders her biological children CHINS, and, with no further explanation, answered in the affirmative. In articulating the unstated connection between mother's abuse of K.P. and the other children, the majority supplies its own explanation that is not reflected in the trial court's analysis.* See In re M.M., 2015 VT 122, ¶ 12, __ Vt. __, __ A.3d __ ("It is not our role to second-guess the family court or to reweigh the evidence." (quotation omitted)).

¶ 26. Second, absent mother's mistreatment of K.P., the trial court's findings of a generally chaotic household, an overwhelmed mother, and a single incident in which mother grabbed J.C. by the arm and seated her on the couch with no finding that mother's actions involved an unreasonable degree of force, would not come close to supporting the conclusion that J.C. and T.F. are CHINS. See In re M.M., 2015 VT 122, ¶ 12 ("A child is CHINS if he or she is without proper parental care or subsistence, education, medical, or other care necessary for his or her well-being" (quoting 33 V.S.A. § 5102(3)(B))). Nor does a parent's "general need for parenting education" trigger a CHINS determination. If these children are CHINS—and I conclude that the record could support a CHINS determination with the proper factual findings—

---

* In fact, the trial court's analysis regarding the other children consists of one conclusory paragraph. The trial court's decision goes to great lengths to detail the abuse of K.P. But, as the trial court admits, "[t]he issue is whether [mother's] disparate treatment of K.P. also renders her biological children . . . in need of care and supervision." In an eight page opinion and order, a whole six and a half pages are dedicated to analyzing K.P. The trial court devotes a mere paragraph to the children actually under review. While the abuse of K.P. is deplorable, the trial court needed findings to support its conclusion the other two children were CHINS. Those findings are missing from the record.

it's primarily because of the risk of harm to the children arising from mother's repeated and callous abuse of K.P. in their presence, not because of the general atmosphere in which that abuse happened to take place.

¶ 27. The trial court's findings with respect to mother's treatment of K.P. were thoughtful and thorough, but the court's explanation of the link between that conduct and the risk faced by the other children was conclusory. The evidence in this record could support a CHINS determination with respect to J.C. and T.F., but the court's findings do not compel such a determination as a matter of law. I would remand this case for additional findings by the trial court.

_____
Associate Justice