VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org



Case No.    23-AP-191

*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant. Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

# ENTRY ORDER

OCTOBER TERM,   2023

In re A.W & J.W., Juveniles       }
(S.W., Mother\*)       }
      }
      }
      }
      }

APPEALED FROM:

Superior Court, Franklin Unit,
Family Division
CASE NOS. 22-JV-01045 & 22-JV-01046
Trial Judge: Howard E. VanBenthuysen (Ret.)

In the above-entitled cause, the Clerk will enter:

Mother appeals the family court's determination that her fifteen-year-old daughter A.W. and ten-year-old son J.W. were children in need of care or supervision (CHINS). We affirm.

At the time this proceeding began, A.W. and J.W. lived with mother and father. In May 2022, the State filed a petition alleging that J.W. was CHINS due to truancy because he had missed approximately ninety days of school that year. The court granted conditional custody to parents in June 2022 in the truancy case.

In July 2022, the State filed petitions alleging that both children were CHINS pursuant to 33 V.S.A. § 5102(3)(B) because they had suffered emotional and educational harm from ongoing domestic violence in the home and had been placed at risk of physical harm by father. The affidavit filed in support of the petition stated that in late June 2022, mother had filed a petition for relief from abuse (RFA) against father and obtained a temporary order prohibiting contact. In early July, mother called police and reported that father had been living in the home in violation of the RFA order. She told police that father had been drinking and that they argued. Father got a loaded gun from a drawer and walked around the house telling mother she could not leave. Mother ran to a neighbor's house and called police. A.W. and J.W. were present in the home during the incident. A responding officer observed that J.W. appeared to be emotionally shaken and was crying.

An investigator from the Department for Children and Families (DCF) went to the home the following day and interviewed the children, both of whom reported that father had previously abused mother but denied that he had ever harmed them. A.W. denied seeing her parents "lay hands on" each other but said that her brother had. Mother had previously reported to J.W.'s school that J.W. was reluctant to go to school because of his anxiety and fear of leaving her alone with father. Father had been convicted of three domestic assaults against mother since 2008. He was charged with aggravated assault based on the July 2022 incident and was still at large when

the CHINS petition was filed. Just prior to the petition being filed, the RFA case was dismissed at mother's request.

The court granted custody to DCF in a temporary care order. The children were placed in the care of their maternal grandmother, who had previously been appointed co-guardian of A.W. with mother. Father's criminal charges resulted in a three-to-six-year prison sentence, which he was serving at the time of the merits hearing.

The court held a combined hearing on the merits of the truancy and neglect petitions in February 2023. The State presented testimony from the police officer who responded to the July 2022 incident, J.W.'s school principal, mother, and the DCF worker assigned to the case. Eight exhibits, including the affidavit mother filed in support of the RFA petition, mother's sworn statement to police following the July 2022 incident, and the school's truancy affidavit, were admitted into evidence.

The court issued a written decision in which it found by clear and convincing evidence that J.W. was truant at the time of the May 2022 petition. The court also found by a preponderance of the evidence that J.W. and A.W. were without proper parental care when the subsequent petitions were filed in July 2022. The court found that the children had been chronically exposed to domestic violence and that both had witnessed the gun incident. The court found that J.W.'s absences from school were due to the violence in the home and were severe enough to impair his ability to advance to the next grade level. At disposition, the parties agreed to dismiss the truancy petition. In May 2023, the court issued a disposition order and approved a case plan calling for reunification with mother by October 2023. Mother appealed.

Mother argues on appeal that the court's decision is based on hearsay evidence that was either not admitted or was improperly admitted at trial, and that without this evidence, the CHINS determination cannot stand. In addition, she argues that witnessing a single incident of domestic violence perpetrated by their father, without evidence of neglect or risk of harm, does not render the children CHINS.

At the CHINS merits hearing, the State must prove by a preponderance of the evidence that the child was in need of care or supervision at the time the petition was filed. In re L.M., 2014 VT 17, ¶¶ 19-20, 195 Vt. 637. In this case, the specific question before the court was whether the children were "without proper parental care," 33 V.S.A. § 5102(3)(B), such that their "well-being [wa]s threatened." In re G.C., 170 Vt. 329, 334 (2000). We review the family court's findings for clear error and will not disturb its findings unless they are unsupported by any evidence in the record. In re M.B., 162 Vt. 229, 239 (1994) (citation omitted).

We agree with mother that the court's finding that J.W. reported having seen his father hit his mother in the head a few weeks before the July 2022 incident is not supported by the record. This finding appears to be based on the DCF worker's affidavit, which was not admitted into evidence, and is not supported by any evidence that was admitted at trial.

We also agree that the court improperly admitted the DCF worker's testimony about statements A.W. made when interviewed shortly after the July 2022 incident—specifically, that father was "waving a gun around" to prevent mother from leaving, and that mother had obtained an RFA order due to "past abuse." The court overruled mother's objection to the testimony on the ground that A.W.'s statements were nonhearsay admissions by a party opponent and

therefore admissible under Vermont Rule of Evidence 801(d)(2). This was error. "Our decisions are clear that hearsay not admissible under the rules of evidence cannot be admitted in a juvenile merits hearing." In re R.M., 150 Vt. 59, 65 (1988). Rule 801(d)(2) provides that a statement is not hearsay if it is offered against a party and is either the party's own statement or a statement that has been adopted or authorized by the party. A.W.'s statements to the DCF worker were not mother's statements, as required by the rule, and they were not statements adopted or authorized by mother. We have previously rejected the notion that out-of-court statements by one party in a CHINS case can be admitted against an adverse party pursuant to Rule 801(d)(2). In re L.M., 2014 VT 17, ¶ 16, 195 Vt. 637; see also Care & Prot. of Sophie, 865 N.E.2d 789, 796 (Mass. 2007) (rejecting argument in child-neglect case that children's out-of-court statements were admissible against father as admissions of a party opponent because equivalent Massachusetts evidentiary rule "makes clear that its definition of nonhearsay extends only to the offer of an extrajudicial statement against the declarant"). Accordingly, the court erred in admitting A.W.'s statements as admissions of a party opponent.

However, we conclude that neither of these errors warrant reversal. "In juvenile proceedings, unsupported findings do not lead to reversal if the remainder of the court's findings, which are supported by the record, are sufficient to sustain the decision." In re D.D., 2013 VT 79, ¶ 34, 194 Vt. 508 (quotation omitted). Similarly, the erroneous admission of evidence does not require reversal unless the "findings independent of the challenged [evidence] do not support a conclusion that the child is without proper parental care." In re M. P., 133 Vt. 144, 147 (1975).

The court found that the children witnessed father brandishing a gun to prevent mother from exiting the family's home and that the children had been repeatedly exposed to domestic violence, which had caused them emotional distress and significantly impacted J.W.'s school attendance. These findings support the court's conclusion that the children were without proper parental care, and they are supported by mother's testimony and out-of-court statements. Following the July 2022 incident, mother told the DCF worker that father had refused to allow her to leave the home, that he had a gun, and that the children were in the home during the incident. In her testimony, mother described previous instances when father had been convicted of assaulting her. She believed that the children had seen her injuries from previous altercations with father. She testified that the children did not like it when she and father fought, that J.W. did not want to leave her alone, and that the children worried about her. She confirmed that the children were in the home during the July 2022 incident, that J.W. had witnessed the altercation, and that father had a gun. In mother's RFA affidavit, which was admitted into evidence, she stated that in June 2022, father had hit her with his elbow in the eye and the nose and told J.W. to say goodbye to her because she was leaving and not coming back. She also asserted that father had previously broken her nose and jaw. In the sworn statement mother gave to police regarding the July 2022 incident, also admitted into evidence, she acknowledged that the children had been placed at risk, stating that she ran to the neighbor's house and called 911 because "some things are not worth saving except my children's safety and well-being."

The court's findings are also supported by the DCF worker's unchallenged testimony that J.W. told her "there was a fight that happened the night prior between his mother and father that involved him crying and being afraid because his mother ran next door, because his dad had a gun and was blocking the doorway." J.W. told the DCF worker that he and mother had been watching a movie when father asked mother to go upstairs. Mother refused, and they began to argue. J.W. further reported that he was crying and hiding under a blanket. J.W. told the DCF

worker that he really liked being at his grandmother's house because there was a lot less yelling and he felt safe there. Although J.W.'s statements were hearsay, "[b]ecause no party objected to the admission of the statements, the court was not prohibited from considering them." In re M.E., 2019 VT 90, ¶ 14, 211 Vt. 320.

Despite mother's argument that witnessing domestic violence does not itself render a child CHINS, the evidence also supports the court's findings that the violence in the home threatened the children's well-being. It was undisputed that J.W. had been absent from school ninety days from September 2021 to January 2022. Mother herself attributed this to J.W.'s fear and anxiety about the violence. J.W.'s poor attendance had caused significant gaps in his learning and impaired his ability to progress to the next grade level. The principal observed J.W. to be isolated from peers and to have difficulty with social interactions. The officer who responded to the July 2022 incident testified that J.W. was visibly upset, crying and hugging his mother. This evidence supported the court's conclusion that J.W.'s well-being was threatened by the violence in the home. While most of the testimony focused on the impact on J.W., the family court could reasonably infer from this evidence that A.W. was also at risk of harm. See E.J.R. v. Young, 162 Vt. 219, 224 (1994) ("The family court may rely on evidence of the treatment of a sibling in concluding that a child is a CHINS.").

Mother argues that a risk of emotional harm is insufficient to support a CHINS finding, citing the definition of harm in 33 V.S.A. § 4912(6). As we have repeatedly explained, the terms defined in § 4912 are "are for use in that particular subchapter, which deals with the reporting of child abuse for potential placement on the child protection registry," and which has completely different procedures and goals than the CHINS statute. In re M.K., 2015 VT 8, ¶ 11, 198 Vt. 233. We have accordingly declined to adopt the definitions contained in § 4912 for use in CHINS proceedings. Instead, because " 'the focus of a CHINS proceeding is the welfare of the child,' " and " 'parents' rights are at most temporarily curtailed' . . . we must liberally construe the relevant terms to carry out the central purpose of neglect and dependency proceedings—the protection of children." Id. ¶ 12 (quoting In re B.R., 2014 VT 37, ¶ 13, 196 Vt. 304). Here, the State showed that the repeated exposure to violence had a serious negative impact on J.W.'s mental health and school attendance, threatening his well-being and likely the well-being of his sister. This was sufficient to demonstrate that J.W. was without proper parental care under 33 V.S.A. § 5102(3)(B).

Moreover, we are not persuaded that there was no risk of physical harm to the children in this case. Father used a gun to prevent mother from leaving the home during a heated argument. A gun is a deadly weapon. If fired—whether purposefully or accidentally—the gun could have easily caused injury to the children. See E.J.R., 162 Vt. at 223 ("Actual and completed harmful acts cannot be, and are not, a precondition to a CHINS finding."). This further supports the CHINS finding.

Mother argues that there was no evidence to support the court's statement that her love for father "is harder to understand unless one accepts the Cycle of Violence theory of domestic violence, which often places victims in a loyalty bind to their abusive partner. They love the partner but endure the violence as the price to be paid for the relationship." Viewed in context, it is clear that this was not a finding, but the court's attempt to explain mother's behavior based on its own experience. Even if it was erroneous, the court's other findings and the evidence are sufficient to support its conclusion that the children were CHINS.

4

Finally, mother claims that she was deprived of due process because ten months passed between July 2022, when the court issued its temporary care order placing the children in DCF custody, and May 2023, when the court issued its disposition order. "[J]uvenile proceedings should be resolved as quickly as is reasonably possible, but the time limits established by the governing statutes . . . are directory and not jurisdictional." In re M.B., 158 Vt. 63, 67 (1992) (quotation and citations omitted). The record shows that the delays prior to merits were due to a combination of factors, including father's initial absence from the proceedings, the parties' unfruitful discussions about stipulating to merits, and the replacement of children's counsel in January 2023. The court began a disposition hearing in April 2023, but continued the hearing so that children's counsel could discuss a proposal to extend the reunification goal with them. Mother attended each of the numerous status conferences and pretrial hearings in the case, as did her attorney, yet neither objected to the delay.[*] Under these circumstances, we see no due-process violation. See id. (concluding that delay of over one year between temporary care order and merits determination did not violate mother's right to due process).

Affirmed.

BY THE COURT:

_____
Harold E. Eaton, Jr., Associate Justice

_____
Karen R. Carroll, Associate Justice

_____
Nancy J. Waples, Associate Justice

---

[*] Mother's attorney's statement at the November 2022 pretrial conference that "I don't see why we'd wait until February" to hold a merits hearing was not sufficiently specific to indicate that she was raising a due-process claim. See State v. Ben-Mont Corp., 163 Vt. 53, 61 (1994) (holding that defendant's mention of notice of fair notice in pretrial motion lacked sufficient specificity and clarity to preserve due-process claim for appellate review).