## In re G.C.

[749 A.2d 28]

No. 99-416

Present: **Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.**

Opinion Filed January 28, 2000

*Michael Rose*, St. Albans, for Appellant.

*William H. Sorrell*, Attorney General, Montpelier, and *Barbara L. Crippen* and *James C. Shea*, Assistant Attorneys General, Waterbury, for Appellee.

**Johnson, J.** Mother appeals the family court's determination that her infant son, G.C., is a child in need of care or supervision (CHINS). We affirm.

Mother suffers from chronic mental illness, described by her doctors as including borderline personality disorder, disassociative identification disorder, and major recurrent depression. Psychiatrists agree that mother's illness is the result of extreme physical, sexual, and emotional abuse that she endured as a small child and throughout her developmental years at the hands of her father and other close relatives. Treatment for mother's illness includes psychotherapy and various medications aimed at combating her anxiety, depression, and delusional thinking.

In 1988, mother and her daughters, then aged one and four, were living with mother's parents, including her abusive father. During that period, the younger daughter was hospitalized on a number of occasions because of excessive vomiting. The Department of Social and Rehabilitation Services (SRS) filed a CHINS petition, alleging that mother had induced the vomiting by giving the child a drug called Ipecac, and further had disconnected and put pin holes in the child's feeding tube at the hospital. Mother stipulated to a CHINS adjudication with respect to G.C. and to a finding that she suffered from Munchausen Syndrome by Proxy (MSP), a mental illness characterized by creating illnesses in one's children to gain attention for oneself. In 1989, the family court terminated mother's parental rights with respect to her daughters.

Over the ensuing ten years, mother took advantage of significant mental health services and made progress in recognizing and dealing with her mental and emotional problems. Nevertheless, she continued to suffer relapses and was hospitalized periodically throughout that period. Between 1992 and 1999, mother had at least seventy contacts with police, many of them concerning threats or attempts to commit suicide. Mother's longest period of stability without intervention lasted only a matter of days. A long-term client of Washington County Mental Health (WCMH), mother relied on the center's support in making her living arrangements over the years.

Sometime in 1998, after discovering that she was pregnant with G.C., mother began lobbying the staff at WCMH to help her find a foster home that would provide twenty-four-hour-a-day support for her and her new baby. After advertising through the newspaper and interviewing potential candidates, mother and WCMH's support team set up a foster-care arrangement with a couple who had been licensed foster parents for the previous five years. The couple had five children of their own ranging in age from five to twenty-five. Under the arrangement set up by WCMH, mother would move in with the

couple a month or so before the baby was born, and the couple would provide support for her and the baby after the birth. Mother began spending nights with her new foster family in late January 1999 and moved in with them on February 1 of that year.

Early on in her pregnancy, mother insisted, and the doctors agreed, that she be taken off her antipsychotic medication so as not to harm the unborn child. As a result, mother's delusional behavior worsened, and she was hospitalized for periods of time. At times, she informed support staff of her delusion that she was carrying a rat rather than a baby, and late in her pregnancy she threatened to abort the fetus. Shortly before she gave birth, she was hospitalized because of her deteriorating mental condition.

G.C. was born on February 17, 1999 and, as planned, lived with mother at the home of the foster family. At first, things appeared to be going fine for mother and baby, but mother became depressed, and on March 7, 1999 she attempted suicide and was hospitalized. Mother indicated to an SRS employee who visited her at the hospital that she was depressed in part because she felt that no one trusted her to care for her baby.

On March 9, 1999, SRS filed a CHINS petition, and the family court entered an emergency order removing G.C. from the foster family's home. Following the merits hearing, which was held over three days in April and May of 1999, the family court granted SRS's petition to adjudicate the child CHINS. Citing mother's history of profound mental illness, including the abuse of her daughter eleven years earlier, the court concluded that G.C. was in need of care or supervision because mother remained the child's legal guardian, and the foster family had not been made aware of the nature and significance of mother's mental disorders. On appeal, mother argues that (1) G.C.'s best interest required the family court to allow her to relitigate the issue of whether she continued to suffer from, or ever suffered from, MSP, and (2) the family court erred in adjudicating the child CHINS because he had proper "parental care" under the arrangement set up by her and the staff at WCMH.

Apparently, at some point during the merits hearing, mother requested that the family court allow her to relitigate the 1988 stipulated finding that she suffers from MSP. Each of the mental health professionals who testified at the hearing, including psychiatrists and other staff from WCMH, a psychologist from the Vermont State Hospital, and another psychologist with expertise in diagnosing MSP, indicated that mother most probably did not suffer from MSP,

and that, in any case, the diagnosis had been based on insufficient information. The experts agreed that mother's explanation for why she harmed her daughter eleven years earlier — to force the State to remove her children from her father's abusive household — was more probable than the MSP diagnosis. Mother claims that she was misdiagnosed, asserting that she agreed to the MSP diagnosis without comprehending the future implications of doing so. She believes that because MSP poses a significant risk to the children of those who suffer from the illness, and is widely recognized as difficult to cure, the faulty diagnosis has colored both the State's and the family court's view of her ability to provide a safe environment for her son. In her view, any interest in protecting the finality of the 1988 finding by estopping her from challenging the earlier diagnosis must yield to the overriding importance of determining G.C.'s best interest.

▪ The problem with mother's argument is that the family court did not rely on the MSP diagnosis in making its CHINS determination. While expressly acknowledging that the validity of the diagnosis might become relevant at later disposition hearings, the court declined to set aside the challenged finding "[a]t this juncture." The court concluded that, regardless of whether the MSP diagnosis was correct, G.C. was in need of care or supervision because of mother's unstable psychiatric history and her inability to maintain herself in the community without significant support, coupled with the fact that she, rather than the foster family, retained legal guardianship over the child. Because the family court did not rely on the MSP diagnosis in making its CHINS determination, and the record supports that determination, we need not address mother's argument that she should be allowed to challenge the 1988 finding that she suffers from MSP.[1] In fact, the family court allowed mother to present evidence challenging the finding, but concluded that, given the other evidence demonstrating that G.C. was in need of care or supervision, it need not determine at that point whether the finding should be stricken from the record.

---

[1] We recognize, however, that the circumstances of this case, including the undisputed expert testimony challenging the earlier MSP diagnosis, bring into question the fairness of relying on that diagnosis eleven years later in dependency proceedings involving other children. See *Trepanier v. Getting Organized, Inc.*, 155 Vt. 259, 265, 583 A.2d 583, 587 (1990) (stating criteria for applying issue preclusion, including requirements that earlier proceeding provided full and fair opportunity to litigate issue, and that applying preclusion in later proceeding is fair).

Irrespective of the earlier MSP diagnosis, mother contends that the family court erred in finding that G.C. was "without proper parental care . . . necessary for his well-being." See 33 V.S.A. § 5502(a)(12)(B). According to mother, she and the staff at WCMH had made arrangements to assure that G.C. would be provided with proper parental care during the anticipated periods when she lapsed into depression or was otherwise unable to cope with caring for the child. She asserts that the arrangements worked just as planned, and that G.C. has never been without proper parental care because her foster family took over care of the child following her suicide attempt and hospitalization.

■ We agree with mother that the use of the term "parental care" in § 5502(a)(12)(B) does not *compel* a CHINS adjudication whenever incapacitated parents leave their children with relatives or others to provide "parental" care during the period of incapacitation. See *In re Ayres*, 513 S.W.2d 731, 735 (Mo. Ct. App. 1974) (dangerous precedent would be set by charging parents with neglect whenever they placed physical custody of their children with surrogate parent or member of extended family; because in-laws had been providing proper parental care at all times, court erred in finding child to be neglected and placing her with state agency); *In re Murphy*, 346 P.2d 367, 370 (Or. 1959) ("legislature did not intend that children without parents or guardians should be declared dependent for that reason alone"; children are not dependent solely because they are receiving "parental care" from persons other than parents or guardians); *Hendricks v. Curry*, 401 S.W.2d 796, 801 (Tex. 1966) (statutory term "parental care" is purely descriptive and refers to kind and quality of care ordinarily provided by parents; "parental care" as defined in statute may be provided by persons who assume parental role in child's life).

Our decision in *In re S.A.M.*, 140 Vt. 194, 436 A.2d 736 (1981), does not suggest otherwise. In that case, a mentally ill mother took her daughter out of state, notwithstanding the grandmother's plea that the mother leave the girl "where she could be cared for." *Id.* at 196, 436 A.2d at 737. When the child was returned to Vermont by an out-of-state protective services agency, the grandparents took her into their care, "but their situation [was] complicated by the fact that they both [were] employed." *Id.* The child was eventually adjudicated CHINS. In response to the mother's argument that the CHINS petition should have been denied because there was no evidence that the grandparents had failed to provide the necessary care for the child, this Court stated that the grandparents were merely caring for

the girl until the CHINS proceeding was commenced, and that the mother was still the child's guardian under the law. See *id.* at 198, 436 A.2d at 738. Thus, *S.A.M.* does not stand for the proposition that a CHINS adjudication is required every time a child is being cared for by persons other than a parent or legal guardian.

Rather, the issue is whether, given all of the circumstances, the child is without proper "parental" care, such that the child's well-being is threatened. Whether a "child is without proper parental care or control necessary for his well-being within the meaning of the statute is a question of fact, . . . and each case must be determined on its own facts." *In re Rathburn*, 128 Vt. 429, 434, 266 A.2d 423, 426 (1970) (citation omitted). Here, in contrast to the situation in *S.A.M.*, G.C. was not foisted upon the foster family without their agreement to the arrangement. To the contrary, the arrangement with the foster family was carefully planned by mother and her support staff at WCMH. According to witnesses at the merits hearing, the arrangement was made with the understanding, given mother's past psychiatric history, that mother might be hospitalized or otherwise incapacitated at times, and that during such periods the foster family would assume full-time care of G.C. Thus, although the court emphasized the witnesses' testimony that the focus of the arrangement was on mother's needs rather than the potential risks to her baby, the evidence indicated that the foster family was made aware that a primary part of its role was to provide support for mother in her parenting of G.C. Indeed, the documentation of the arrangement with the foster couple refers to them as "co-parent[s]" and "assigned substitute parents." Further, as the court acknowledged, the same witnesses who stated that their main focus was on addressing mother's problems also stated that they found any potential risk to the child to be minimal.

Nevertheless, we conclude that the record supports the family court's CHINS adjudication in this case. The psychiatric history relied upon by the family court revealed that (1) notwithstanding mother's claim that the harm she inflicted upon her one-year-old daughter eleven years earlier resulted from her desire to protect her children from the abusive environment in which they were living, mother had a history of child abuse; (2) in the decade since her first two children had been taken from her, mother had been periodically hospitalized for threatening or attempting suicide; (3) during that period, mother had had over seventy contacts with police, and her longest period of stability without outside intervention could be

measured in days; (4) mother and her doctors conceded that she was incapable of caring for herself, let alone a child, without substantial support; (5) problems stemming from mother's mental illness resulted in her being hospitalized only days before G.C.'s birth; (6) mother attempted suicide approximately two weeks after G.C.'s birth; (7) although the foster couple knew that they would be responsible for providing G.C. care in the event mother was unable to do so, they had not been informed of the depth or details of mother's mental problems; (8) the foster couple did not have legal guardianship over G.C. and thus could not stop mother from leaving the foster home with the child if she chose to do so; and (9) mother stated after her latest suicide attempt that she was depressed in part because the current twenty-four-hour-a-day foster care arrangement made her feel like she was not trusted to care for her child.

Notwithstanding the mitigating circumstances cited by mother, these facts support the family court's order finding G.C. to be in need of care or supervision. See *In re M.B.*, 158 Vt. 63, 70, 605 A.2d 515, 519 (1992) (State has burden of proving CHINS by preponderance of evidence; family court's findings in juvenile proceeding will stand on review unless they are unsupported by any credible evidence). While there was no evidence that the foster-care arrangement had failed to provide G.C. support at the time the infant was removed from the foster family's home, the court correctly focused on "the likelihood of prospective harm to the child." *E.J.R. v. Young*, 162 Vt. 219, 223, 646 A.2d 1284, 1286 (1994) (dependency proceedings are preventative as well as remedial in nature). Considering mother's psychiatric history, the danger of harm to G.C. was substantial enough for the State to intervene and examine the situation while protecting G.C. from any potential harm. Indeed, even mother's own psychiatrist conceded that the foster-care arrangement he had helped set up posed some risk to G.C.

While we conclude that the State met its burden of proving by a preponderance of the evidence[2] that G.C. was in need of care and supervision, the fact that mother's mental illness prevents her from assuming parental duties without support does not necessarily, in and of itself, satisfy the State's burden in the disposition phase of the dependency proceedings in this case. Cf. *In re N.H.*, 135 Vt. 230, 237,

---

[2]Although the family court noted that the State requested the court to make its findings by clear and convincing evidence, the court did not indicate that its findings were made under the higher standard.

373 A.2d 851, 856-57 (1977) (notwithstanding existence of questions concerning father's ability to assume active, responsible parental role, trial court should have placed child with father because it was undisputed that "he, with the support of his parents, stands willing and able to provide N.H. with a family environment").

*Affirmed.*