NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 107

No. 2015-471

| | |
|---|---|
| In re B.G., Juvenile | Supreme Court |
| | On Appeal from<br>Superior Court, Addison Unit,<br>Family Division |
| | June Term, 2016 |

Samuel Hoar, Jr., J.

Michael Rose, St. Albans, for Appellant Mother.

William H. Sorrell, Attorney General, and Benjamin D. Battles, Assistant Attorney General, Montpelier, for Appellee.

Joshua S. O'Hara, Appellate Defender, Montpelier, for Appellee Juvenile.

PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.

¶ 1.    **SKOGLUND, J**.  Mother appeals the family court's order concluding that her son B.G. is a child in need of care or supervision (CHINS). Mother argues that the court erred in finding that B.G. was abandoned or without proper parental care because mother made arrangements for B.G.'s care. We affirm the CHINS adjudication on the basis that B.G. was abandoned.

¶ 2.    B.G. was born in September 2006. Mother and father separated in 2007. B.G. has a younger half-sister, C.B., born in August 2009. Mother's relationships with B.G.'s father and her two subsequent partners, including C.B.'s father, were abusive. In 2010, mother was prescribed pain medication, and this led to a heroin addiction. She used between ten and fifty bags

of heroin a day and was under the influence at times when the children were in her care. Mother often left B.G. with his paternal grandfather and step-grandmother. In 2011, when mother planned to move to New York, grandparents began caring for B.G. full time. At their request, mother signed a letter allowing grandparents to communicate with school officials and to get B.G. medical attention. B.G.'s step-grandmother has been responsible for all interactions with school, doctors, dentists, and counselors. Mother did not participate in any of these aspects of B.G.'s life. After several failed attempts at residential treatment, mother began medication-assisted treatment in October 2014. She continued to use marijuana, and this made her ineligible for take-home doses, requiring her to travel to Rutland daily.

¶ 3.    B.G. witnessed the domestic violence in mother's relationships even after 2011 when his time with mother was quite limited. B.G. is afraid of mother's former partners, has nightmares, and has a high level of anxiety. Mother did not take steps to get counseling for B.G. and did not participate once B.G.'s grandmother arranged for counseling.

¶ 4.    In January 2014, the court removed B.G.'s half-sister, C.B., from mother's home. The court issued a Temporary Custody Order transferring custody of the half-sister to grandparents with protective supervision by the Department for Children and Families (DCF). There was no order issued pertaining to B.G., but the court noted that there was an agreement reached by DCF, mother, and step-grandmother that if mother tried to remove B.G. from step-grandmother's care, DCF would be notified and would seek a conditional custody order. Mother did not progress past supervised visits with C.B.[1]

¶ 5.    In January 2015, the State filed a petition alleging B.G. was CHINS for lack of proper parental care. In October, the State filed an amended petition adding an allegation that B.G.

---

[1] The family court subsequently granted a petition to terminate mother's rights, and this Court affirmed. In re C.B., No. 2016-014 (Vt. May 12, 2016) (unpub. mem.), https://www.vermontjudiciary.org/UPEO2011Present/eo16-014.pdf  [https://perma.cc/Z3DT-RS5S].

2

was also CHINS because he had been abandoned. A contested hearing was held in November 2015.[2] Following the hearing, the court found that there was sufficient evidence to support the petition on both counts. The court found that mother had effectively abandoned B.G. by failing to exercise any parental responsibilities and voluntarily ceding all responsibility to grandparents. The court concluded that prior to January 2014 mother was "either unwilling or unable to exercise any meaningful degree of parental responsibility for B.G." It further concluded that from January 2014 until the date of the petition, mother had exercised no parental responsibilities and that "while this may have been by agreement with DCF, it was in effect a more formal recognition of what had been to that point a de facto abandonment." It noted that mother had the opportunity to assert parental rights and responsibilities but chose not to do so. The court also found that mother was unable to provide B.G. with proper parental care. The court explained that at the time the petition was filed, in January 2015, mother had not addressed her own addiction and victimization issues sufficiently to provide B.G. with appropriate parental care. Although she was in a program to treat her addiction, she continued to use marijuana and needed to travel daily to Rutland for treatment. In addition, mother required counseling to treat her history as a serial victim of abusive relationships. Mother appeals.

¶ 6. A child may be adjudicated CHINS when the State demonstrates, among other things, that the child has been "abandoned," or "is without proper parental care or subsistence, education, medical, or other care necessary for his or her well-being." 33 V.S.A. § 5102(3)(A), (B). The State has the burden of demonstrating CHINS by a preponderance of the evidence. Id. § 5315(a).

---

[2] At the final hearing, father signed a stipulation admitting that B.G. was CHINS for lack of proper parental care based on the facts that at the time the petition was filed father's contact with B.G. was minimal and father had previously physically restrained B.G. and presented a risk of harm to B.G. We do not reach the question of whether this stipulation was sufficient on its own to support a CHINS determination.

¶ 7.     We begin with the court's finding that B.G. was CHINS because he was abandoned. Under the statute, there are several different circumstances that can result in abandonment:

> A person is considered to have abandoned a child if the person is: unwilling to have physical custody of the child; unable, unwilling, or has failed to make appropriate arrangements for the child's care; unable to have physical custody of the child and has not arranged or cannot arrange for the safe and appropriate care of the child; or has left the child with a care provider and the care provider is unwilling or unable to provide care or support for the child, the whereabouts of the person are unknown, and reasonable efforts to locate the person have been unsuccessful.

Id. § 5102(3)(A).

¶ 8.     Mother focuses on the third circumstance—when a parent is "unable to have physical custody of the child and has not arranged or cannot arrange for the safe and appropriate care of the child." Id. She argues that she did not abandon her child because she arranged for the "safe and appropriate care of" B.G. with his grandparents. Id. In contrast, the State argues that the portion of the statutory definition applicable in this case is the first circumstance— abandonment due to mother's unwillingness to have physical custody of her child—and this circumstance is not dependent on whether mother arranged for appropriate care.

¶ 9.     We conclude that the findings support abandonment due to mother's unwillingness to care for B.G. The evidence demonstrated that at the time the CHINS petition was filed, mother had not been exercising any parental responsibilities for at least a year. Mother was not taking physical care of B.G. and exercised only sporadic visitation. Further, she did not participate in B.G.'s life in any meaningful way, voluntarily abdicating all responsibility for B.G.'s life, including his schooling and medical needs, to B.G.'s grandparents. While mother testified that she wanted to reunite with her child, the court was within its discretion in failing to credit mother's testimony and instead relying on mother's actions to conclude that she was unwilling to take physical custody of B.G. and therefore abandoned him within the meaning of the statute. See In

4

re A.F., 160 Vt. 175, 178, 624 A.2d 867, 869 (1993) (explaining that family court has discretion to determine witness's credibility and weigh evidence).

¶ 10. Because we conclude that the CHINS adjudication was proper under § 5102(3)(A), we need not reach the question of whether B.G. was also CHINS due to lack of proper parental care under § 5102(3)(B).

Affirmed.

FOR THE COURT:

_____

Associate Justice

¶ 11. **DOOLEY, J., concurring.** I concur in the majority decision that the trial court could find that B.G. may be adjudicated a child in need of care or supervision (CHINS) under 33 V.S.A. § 5102(3)(A) on the basis that the child was abandoned. I agree that the statute is so broadly written that it covers even a case where the child is being safely and appropriately cared for as arranged by the parent. I am writing this concurrence, as I did in In re M.O., 2015 VT 120, ¶¶ 17-25, ___ Vt. ___,131 A.3d 738 (Dooley, J., concurring), to point out that the fact that the Department for Children and Families (DCF) can legally intervene to have the child declared a CHINS does not mean that it should do so in all cases. At least on the record before us, it appears that the child is being cared for safely and appropriately by the step-grandmother. The CHINS adjudication means the commitment of extensive resources by DCF and the legal system to this mother and child at a time when there are not enough such resources to go around and when alternatives may be available that will protect the interests of the child in a less resource-intensive way. As I said in M.O., "I think DCF and the Legislature need to take a hard look at cases like this one to determine whether there is a way to protect a child in circumstances like this that involve an alternative to DCF custody." Id. ¶ 23. I make the same point if custody remains with the step-grandmother but the extensive resources of an overloaded legal system go to an adjudication and

5

an appeal followed by ongoing case supervision. All stakeholders in this system must work together to prioritize and advance expeditiously the cases where legal intervention is necessary to protect the critical interests of the child; we cannot let other cases undermine that challenging mission.

_____
Associate Justice

¶ 12. **ROBINSON, J**., **dissenting.** Nearly 4% of American children live in a home without a legal parent present.[3] Of those children living in a home without a legal parent, 1.7 million live with a grandparent, 685,000 live with another relative, 203,000 live with a nonrelative, and only 214,000 live in a legally recognized foster home.[4] While some of these nonparental living arrangements may arise from informal involvement of the State, there are clearly more than 2 million children being raised, either on a short- or long-term basis, by people who are not legal parents pursuant to a voluntary arrangement with the children's legal parent. Most of these children are being raised by a grandparent. If a child is in need of care or supervision (CHINS) whenever that child's parent or parents are unable to provide appropriate parental care, even when they have made appropriate arrangements for a willing and able grandparent to provide that care, then the state would be free to intervene in the lives of millions of children who face no particular risk of harm. This result is inconsistent not only with the expressed intent of the Legislature, but

_____

[3] Forum on Child & Family Statistics, America's Children in Brief: Key National Indicators of Well-Being, 2016 tbl. FAM1.A [hereinafter America's Children] (providing table on "Family Structure and Children's Living Arrangements: Percentage of Children Ages 0-17 by Presence of Parents in Household and Race and Hispanic Origin, 1980-2015"), http://www.childstats.gov/americaschildren/index.asp [http://perma.cc/QY6K-CHZP].

[4] Id. tbl. FAM1.B (providing table on "Family Structure and Children's Living Arrangements: Detailed Living Arrangements of Children by Gender, Race and Hispanic Origin, Age, Parent's Education, and Poverty Status, 2015"); see also id. fig. FAM1.B (providing figure on "Percentage of Children Ages 0-17 Living in Various Family Arrangements, 2015," reflecting proportions of various arrangements among children who live in homes without legal parents).

also with the constitutional imperative that "any time the State seeks to interfere with the rights of parents on the generalized assumption that the children are in need of care and supervision, it must first produce sufficient evidence to demonstrate that the statutory directives allowing such intervention are fully satisfied." In re N.H., 135 Vt. 230, 235, 373 A.2d 851, 855 (1977).

¶ 13. The trial court found that in 2011, in planning to move out of state, B.G.'s mother asked the child's paternal step-grandmother and grandfather to care for the child full time. Since that time, B.G.'s paternal step-grandmother, "in part by agreement and in part by default," has effectively acted as the child's parent, exercising responsibility for "all dealings with his school, doctors, dentists, and counselors." Mother has failed to participate in any meaningful way in these activities, "exercising only rights of visitation and then only as convenient." In January 2014, mother agreed to effectively maintain the status quo, leaving the child with the paternal step-grandmother. Mother, step-grandmother, and the Department for Children and Families (DCF) agreed that if mother attempted to remove the child from step-grandmother's home, DCF would be called and would seek a conditional custody order. Mother had supervised visits with the child from that time until DCF filed a CHINS petition in January 2015. The court found that mother has longstanding and not fully addressed issues arising from addiction and victimization and is not ready to assume parental responsibilities for the child.

¶ 14. The court made no findings that the child, in the care of his step-grandmother, lacks any care necessary for his well-being or faces risk of harm, that mother or father poses a risk to him in the context of the current arrangement, or that there is an imminent risk that mother or father will seek to remove the child from his step-grandmother's home without DCF approval. The court made no findings that step-grandmother or grandfather has been unable to exercise parental responsibilities with doctors, dentists, counselors, or the school. And the court did not find that the arrangements mother made with step-grandmother did not provide for safe and

appropriate care, that step-grandmother is unwilling or unable to provide care or support for the child, or that mother is unwilling to have physical custody of the child.

¶ 15.    Although it's admittedly a close case, the trial court's findings in this case do not support a CHINS determination on the basis of abandonment.  33 V.S.A. § 5102(3)(A) (CHINS A).  Moreover, I cannot affirm on the basis of the trial court's alternate holding that the child is "without proper parental care or subsistence, education, medical, or other care necessary for his . . . well-being."  Id. § 5102(3)(B) (CHINS B).

¶ 16.    I disagree that the findings support a conclusion that mother in this case is unwilling to have physical custody of the child.  The "CHINS A" section defines CHINS to include a child who:

> has been abandoned or abused by the child's parent, guardian, or custodian.  A person is considered to have abandoned a child if the person is: unwilling to have physical custody of the child; unable, unwilling, or has failed to make appropriate arrangements for the child's care; unable to have physical custody of the child and has not arranged or cannot arrange for the safe and appropriate care of the child; or has left the child with a care provider and the care provider is unwilling or unable to provide care or support for the child, the whereabouts of the person are unknown, and reasonable efforts to locate the person have been unsuccessful.

Id. § 5102(3)(A).  The trial court did not specifically identify which prong of § 5102(3)(A) applies in this case, but the majority focuses on the first: that mother was unwilling to have physical custody of the child.[5]

¶ 17.    The bases for this conclusion are that mother voluntarily ceded parental responsibilities to the child's step-grandmother; subsequently exercised only rights of visitation and then only as convenient; agreed with DCF in January 2014 that the child could remain in the

---

[5]  The majority rightly does not suggest that the trial court's findings could support a conclusion that the child's parents failed to make safe and appropriate arrangements for the child's care or that the child's care provider is unwilling or unable to provide care or support for the child and the whereabouts of the parents are unknown.  See 33 V.S.A. § 5102(3)(A).  The court's findings could not support either of these conclusions.

8

step-grandmother's home and that DCF would seek a conditional custody order if she sought to remove the child; and that mother had not asserted parental rights and responsibilities after that time. The court concluded that mother's arrangement with the step-grandmother amounted to a "de facto abandonment," and that "[i]t remained open to [mother] to assert parental rights and responsibilities, and she chose not to do so."

¶ 18. Especially bearing in mind the ubiquity of these kinds of voluntary arrangements, and the requirement that a court ensure "that the statutory directives allowing such intervention are fully satisfied," In re N.H., 135 Vt. at 235, 373 A.2d at 855, I cannot join the conclusion that mother is "unwilling to have physical custody of the child" for two main reasons.

¶ 19. First, the majority's analysis suggests that voluntary caregiving arrangements are time-limited, and that once a parent entrusts the care of a child to a grandparent or another, at some point the parent is deemed to have legally abandoned the child without regard to the willingness of the grandparent to continue providing care, and with no evidence that the parent actually declined to reassume physical custody of the child. If this is true, then thousands—perhaps millions—of family arrangements that are functioning just fine, with no risk to the child, are now open to state intervention.

¶ 20. Because of variations in family structures, minority families are disproportionately subject to such intervention because a disproportionate number of children in minority communities live with a grandparent and no parent. Compare America's Children, supra, tbl. FAM1.B (stating that 30% of children who live with a grandparent and no parent are black and 21% are Hispanic), with K. Humes, et al., U.S. Census Bureau, Overview of Race and Hispanic Origin: 2010 tbl.1 (March 2011), http://www.census.gov/prod/cen2010/briefs/c2010br-02.pdf [https://perma.cc/LPJ2-UDNH] (showing that in 2010 close to 13% and 16% of the population were black and Latino/Hispanic, respectively). If a parent entrusts the care of his or her child to a grandparent, and that grandparent is willingly raising the child without incident or risk to the child,

9

and does not seek to return care of child to the parent, or to otherwise alter the arrangement without success, then grounds for state intervention in the family do not exist.

¶ 21. Second, the trial court's findings reflect that for the year preceding the State's petition, mother had agreed with DCF and the step-grandmother that mother would not seek to assert physical custody over the child, and that DCF would seek court intervention if she did. This, rather than mother's conduct in years prior, is the relevant time frame for assessing whether the child is CHINS. In re D.T., 170 Vt. 148, 156, 743 A.2d 1077, 1084 (1999) ("The issue before the family court at the merits stage of a CHINS proceeding is a determination of whether, at the time of the filing of the petition, the juvenile is a child in need of care and supervision."). Mother's continued compliance with DCF's informal requirement that she not seek physical custody over the child cannot be construed as an unwillingness to have physical custody. Otherwise, the many parents who enter into similar informal understandings with DCF face a risk that they may be deemed to have abandoned their child by failing to repudiate such agreements after some unspecified period of time.

¶ 22. The alternate basis for the trial court's determination—that this child is without proper parental care or subsistence—presents an easier question. The law is clear that a CHINS finding cannot be predicated on the unfitness of a noncustodial parent who poses no threat to a child. When a parent who is unable to provide proper parental care himself or herself makes appropriate arrangements for the child's care, the child is receiving proper parental care, and the child's welfare is not in jeopardy, that child cannot be a CHINS B.

¶ 23. We have long emphasized that the relevant question under 33 V.S.A. § 5102(3)(B) is child-centered; the issue is not the fitness of one or both parents, but is the well-being of the child. In In re B.R., this Court emphasized that the focus of a CHINS proceeding is the child's welfare, and that the time to focus on the fitness of a parent is at disposition. 2014 VT 37, ¶¶ 13-14, 196 Vt. 304, 97 A.3d 867; see also id. ¶ 29 (Robinson, J., dissenting) ("[A] court does not make

a CHINS determination 'against' or 'as to' one parent or another. Rather, a CHINS finding reflects that a <u>child</u> . . . is without proper parental care . . . ."). That's why "a child who lives with a responsible and capable parent who is meeting the child's needs is not a CHINS just because a noncustodial, nonabusive parent who is not caring for the child is incapable of meeting the child's needs." <u>Id</u>. ¶ 32 (Robinson, J., dissenting).

¶ 24. We have likewise made it clear that "parental care" need not be provided by a legal parent; the term "parental" describes the <u>type</u> of care a child requires, but does not restrict the caregiving to a legal parent. See <u>In re G.C.</u>, 170 Vt. 329, 333-34, 749 A.2d 28, 31-32 (2000).

¶ 25. In <u>In re G.C.</u>, we considered a case in which a child's mother had a history of severe mental illness and had arranged for her and her newborn child to live with a foster family. The arrangement worked well at first, but mother's mental health deteriorated and she was hospitalized after attempting suicide. The family court determined that the child was a CHINS, and mother appealed. She argued that she had made appropriate arrangements to ensure that the child would be provided proper parental care during the anticipated periods when she lapsed into depression or was otherwise unable to cope with caring for the child, that the arrangements worked as planned, and that the child had never been without proper parental care because the foster family took over care of the child following her suicide attempt and hospitalization.

¶ 26. Although this Court ultimately affirmed the CHINS determination, our discussion, and the cases we relied upon, establish that a child cannot be adjudicated CHINS B merely because a parent has made arrangements for another to provide appropriate care for the child in the absence of substantial risk to the child's welfare arising from that arrangement. We explained:

> We agree with mother that the use of the term "parental care" in [the statutory definition of CHINS] does not <u>compel</u> a CHINS adjudication whenever incapacitated parents leave their children with relatives or others to provide "parental" care during the period of incapacitation. See <u>In re Ayres</u>, 513 S.W.2d 731, 735 (Mo. Ct. App. 1974) (dangerous precedent would be set by charging parents with neglect whenever they placed physical custody of their children with surrogate parent or member of extended family; because in-

11

> laws had been providing proper parental care at all times, court erred in finding child to be neglected and placing her with state agency); In re Murphy, 346 P.2d 367, 370 (Or. 1959) ("legislature did not intend that children without parents or guardians should be declared dependent for that reason alone"; children are not dependent solely because they are receiving "parental care" from persons other than parents or guardians); Hendricks v. Curry, 401 S.W.2d 796, 801 (Tex. 1966) (statutory term "parental care" is purely descriptive and refers to kind and quality of care ordinarily provided by parents; "parental care" as defined in statute may be provided by persons who assume parental role in child's life).

Id. at 333, 749 A.2d at 31.

¶ 27. We affirmed the CHINS determination in In re G.C., not because the child's parental care was being provided in part by someone other than mother, and not because mother was in some abstract sense unable to provide proper care for the child, but because on the facts of that case the parental care arrangement posed a risk to the child. Mother continued to live with the child and foster family, the foster couple had not been informed of the depth of mother's mental health challenges, the foster couple could not stop mother from leaving their home with the child, and mother testified that her most recent suicide attempt was in part a response to the twenty-four-hour-a-day foster care arrangement that made her feel as though she was not trusted. Id. at 334-35, 749 A.2d at 32. The arrangement mother relied upon to ensure proper care for G.C. was not working.

¶ 28. In this case, the court made no finding that there was a risk that, notwithstanding the agreement with DCF and the child's step-grandmother, mother would attempt to remove the child from the home. In fact, in contrast to In re G.C., where the mother who posed a risk to the child lived in the same home as the child, in this case mother's contact with the child was limited to supervised visits. Moreover, this was not a disposition hearing in which mother sought custody of the child. Mother's ability to care for this child (or father's for that matter) was only relevant in the context of a hypothetical scenario that the court did not find was actually likely to arise. The

12

threshold question for CHINS B purposes was whether this child was without proper parental care, and the trial court made no findings to support a determination that he was.

¶ 29. I do not mean to suggest that step-grandmother is forever doomed to continue caring for this child without formal legal authority. Mother could agree to a guardianship or even adoption wholly apart from any formal state intervention. Step-grandmother could indicate an unwillingness to continue to care for the child under the current terms—thereby potentially triggering either a CHINS B proceeding as projected by DCF if mother seeks to take the child back or a CHINS A proceeding if she declines to do so. But I do conclude that given the trial court's findings as to the existing circumstances, its CHINS conclusion is not warranted under either potential prong of the CHINS statute.

_____
Associate Justice

13