Robinson, J.,
¶ 12. dissenting. Nearly 4% of American children live in a home without a legal parent present.[3] Of those children *322 living in a home without a legal parent, 1.7 million live with a grandparent, 685,000 live with another relative, 208,000 live with a nonrelative, and only 214,000 live in a legally recognized foster home.[4] While some of these nonparental living arrangements may arise from informal involvement of the State, there are clearly more than 2 million children being raised, either on a short- or long-term basis, by people who are not legal parents pursuant to a voluntary arrangement with the children’s legal parent. Most of these children are being raised by a grandparent. If a child is in need of care or supervision (CHINS) whenever that child’s parent or parents are unable to provide appropriate parental care, even when they have made appropriate arrangements for a willing and able grandparent to provide that care, then the State would be free to intervene in the lives of millions of children who face no particular risk of harm. This result is inconsistent not only with the expressed intent of the Legislature, but also with the constitutional imperative that “any time the State seeks to interfere with the rights of parents on the generalized assumption that the children are in need of care and supervision, it must first produce sufficient evidence to demonstrate that the statutory directives allowing such intervention are fully satisfied.” In re N.H., 135 Vt. 230, 235, 373 A.2d 851, 855 (1977).
¶ 13. The trial court found that in 2011, in planning to move out of state, B.G.’s mother asked the child’s paternal step-grandmother and grandfather to care for the child full time. Since that time, B.G.’s paternal step-grandmother, “in part by agreement and in part by default,” has effectively acted as the child’s parent, exercising responsibility for “all dealings with his school, doctors, dentists, and counselors.” Mother has failed to participate in any meaningful way in these activities, “exercising only rights of visitation and then only as convenient.” In January 2014, mother agreed to effectively maintain the status quo, leaving the child with the paternal step-grandmother. Mother, step-grandmother, *323 and the Department for Children and Families (DCF) agreed that if mother attempted to remove the child from step-grandmother’s home, DCF would be called and would seek a conditional custody order. Mother had supervised visits with the child from that time until DCF filed a CHINS petition in January 2015. The court found that mother has longstanding and not fully addressed issues arising from addiction and victimization and is not ready to assume parental responsibilities for the child.
¶ 14. The court made no findings that the child, in the care of his step-grandmother, lacks any care necessary for his well-being or faces risk of harm, that mother or father poses a risk to him in the context of the current arrangement, or that there is an imminent risk that mother or father will seek to remove the child from his step-grandmother’s home without DCF approval. The court made no findings that step-grandmother or grandfather has been unable to exercise parental responsibilities with doctors, dentists, counselors, or the school. And the court did not find that the arrangements mother made with step-grandmother did not provide for safe and appropriate care, that step-grandmother is unwilling or unable to provide care or support for the child, or that mother is unwilling to have physical custody of the child.
¶ 15. Although it’s admittedly a close case, the trial court’s findings in this case do not support a CHINS determination on the basis of abandonment. 33 V.S.A. § 5102(3)(A) (CHINS A). Moreover, I cannot affirm on the basis of the trial court’s alternate holding that the child is “without proper parental care or subsistence, education, medical, or other care necessary for his . . . well-being.” Id. § 51Q2(3)(B) (CHINS B).
¶ 16. I disagree that the findings support a conclusion that mother in this case is unwilling to have physical custody of the child. The “CHINS A” section defines CHINS to include a child who:
has been abandoned or abused by the child’s parent, guardian, or custodian. A person is considered to have abandoned a child if the person is: unwilling to have physical custody of the child; unable, unwilling, or has failed to make appropriate arrangements for the child’s care; unable to have physical custody of the child and has not arranged or cannot arrange for the safe and appropriate care of the child; or has left the child with a care *324 provider and the care provider is unwilling or unable to provide care or support for the child, the whereabouts of the person are unknown, and reasonable efforts to locate the person have been unsuccessful.
Id. § 5102(3)(A). The trial court did not specifically identify which prong of § 5102(3)(A) applies in this case, but the majority focuses on the first: that mother was unwilling to have physical custody of the child.[5]
¶ 17. The bases for this conclusion are that mother voluntarily ceded parental responsibilities to the child’s step-grandmother; subsequently exercised only rights of visitation and then only as convenient; agreed with DCF in January 2014 that the child could remain in the step-grandmother’s home and that DCF would seek a conditional custody order if she sought to remove the child; and that mother had not asserted parental rights and responsibilities after that time. The court concluded that mother’s arrangement with the step-grandmother amounted to a “de facto abandonment,” and that “[i]t remained open to [mother] to assert parental rights and responsibilities, and she chose not to do so.”
¶ 18. Especially bearing in mind the ubiquity of these kinds of voluntary arrangements, and the requirement that a court ensure “that the statutory directives allowing such intervention are fully satisfied,” In re N.H., 135 Vt. at 235, 373 A.2d at 855, I cannot join the conclusion that mother is “unwilling to have physical custody of the child” for two main reasons.
¶ 19. First, the majority’s analysis suggests that voluntary caregiving arrangements are time-limited, and that once a parent entrusts the care of a child to a grandparent or another, at some point the parent is deemed to have legally abandoned the child without regard to the willingness of the grandparent to continue providing care, and with no evidence that the parent actually declined to reassume physical custody of the child. If this is true, then thousands — perhaps millions — of family arrangements that are functioning just fine, with no risk to the child, are now open to state intervention.
*325 ¶ 20. Because of variations in family structures, minority families are disproportionately subject to such intervention because a disproportionate number of children in minority communities live with a grandparent and no parent. Compare America’s Children, supra, tbl. FAM1.B (stating that 30% of children who live with a grandparent and no parent are black and 21% are Hispanic), with K. Humes, et ah, U.S. Census Bureau, Overview of Race and Hispanic Origin: 2010 tbl.l (March 2011), http://www.census.gov/ prod/cen2010/briefs/c2010br-02.pdf [https://perma.cc/LPJ2-UDNH] (showing that in 2010 close to 13% and 16% of the population were black and Latino/Hispanic, respectively). If a parent entrusts the care of his or her child to a grandparent, and that grandparent is willingly raising the child without incident or risk to the child, and does not seek to return care of child to the parent, or to otherwise alter the arrangement without success, then grounds for state intervention in the family do not exist.
¶ 21. Second, the trial court’s findings reflect that for the year preceding the State’s petition, mother had agreed with DCF and the step-grandmother that mother would not seek to assert physical custody over the child, and that DCF would seek court intervention if she did. This, rather than mother’s conduct in years prior, is the relevant time frame for assessing whether the child is CHINS. In re D.T., 170 Vt. 148, 156, 743 A.2d 1077, 1084 (1999) (“The issue before the family court at the merits stage of a CHINS proceeding is a determination of whether, at the time of the filing of the petition, the juvenile is a child in need of care and supervision.”). Mother’s continued compliance with DCF’s informal requirement that she not seek physical custody over the child cannot be construed as an unwillingness to have physical custody. Otherwise, the many parents who enter into similar informal understandings with DCF face a risk that they may be deemed to have abandoned their child by failing to repudiate such agreements after some unspecified period of time.
¶ 22. The alternate basis for the trial court’s determination — that this child is without proper parental care or subsistence — presents an easier question. The law is clear that a CHINS finding cannot be predicated on the unfitness of a noncustodial parent who poses no threat to a child. When a parent who is unable to provide proper parental care himself or herself makes appropriate arrangements for the child’s care, the child is receiving proper parental care, and the child’s welfare is not in jeopardy, that child cannot be a CHINS B.
*326 ¶ 23. We have long emphasized that the relevant question under 33 V.S.A. § 5102(3)(B) is child-centered; the issue is not the fitness of one or both parents, but is the well-being of the child. In In re B.R. this Court emphasized that the focus of a CHINS proceeding is the child’s welfare, and that the time to focus on the fitness of a parent is at disposition. 2014 VT 37, ¶¶ 13-14, 196 Vt. 304, 97 A.3d 867; see also id. ¶ 29 (Robinson, J., dissenting) (“[A] court does not make a CHINS determination ‘against’ or ‘as to’ one parent or another. Rather, a CHINS finding reflects that a child ... is without proper parental care . . . .”). That’s why “a child who lives with a responsible and capable parent who is meeting the child’s needs is not a CHINS just because a noncustodial, nonabusive parent who is not caring for the child is incapable of meeting the child’s needs.” Id. ¶ 32 (Robinson, J., dissenting).
¶ 24. We have likewise made it clear that “parental care” need not be provided by a legal parent; the term “parental” describes the type of care a child requires, but does not restrict the caregiving to a legal parent. See In re G.C., 170 Vt. 329, 333-34, 749 A.2d 28, 31-32 (2000).
¶25. In In re G.C. we considered a case in which a child’s mother had a history of severe mental illness and had arranged for her and her newborn child to live with a foster family. The arrangement worked well at first, but mother’s mental health deteriorated and she was hospitalized after attempting suicide. The family court determined that the child was a CHINS, and mother appealed. She argued that she had made appropriate arrangements to ensure that the child would be provided proper parental care during the anticipated periods when she lapsed into depression or was otherwise unable to cope with caring for the child, that the arrangements worked as planned, and that the child had never been without proper parental care because the foster family took over care of the child following her suicide attempt and hospitalization.
¶ 26. Although this Court ultimately affirmed the CHINS determination, our discussion, and the cases we relied upon, establish that a child cannot be adjudicated CHINS B merely because a parent has made arrangements for another to provide appropriate care for the child in the absence of substantial risk to the child’s welfare arising from that arrangement. We explained:
*327 We agree with mother that the use of the term “parental care” in [the statutory definition of CHINS] does not compel a CHINS adjudication whenever incapacitated parents leave their children with relatives or others to provide “parental” care during the period of incapacitation. See In re Ayres, 513 S.W.2d 731, 735 (Mo. Ct. App. 1974) (dangerous precedent would be set by charging parents with neglect whenever they placed physical custody of their children with surrogate parent or member of extended family; because in-laws had been providing proper parental care at all times, court erred in finding child to be neglected and placing her with state agency); In re Murphy, 346 P.2d 367, 370 (Or. 1959) (“legislature did not intend that children without parents or guardians should be declared dependent for that reason alone”; children are not dependent solely because they are receiving “parental care” from persons other than parents or guardians); Hendricks v. Curry, 401 S.W.2d 796, 801 (Tex. 1966) (statutory term “parental care” is purely descriptive and refers to kind and quality of care ordinarily provided by parents; “parental care” as defined in statute may be provided by persons who assume parental role in child’s life).
Id. at 333, 749 A.2d at 31.
¶ 27. We affirmed the CHINS determination in In re G.C., not because the child’s parental care was being provided in part by someone other than mother, and not because mother was in some abstract sense unable to provide proper care for the child, but because on the facts of that case the parental care arrangement posed a risk to the child. Mother continued to live with the child and foster family, the foster couple had not been informed of the depth of mother’s mental health challenges, the foster couple could not stop mother from leaving their home with the child, and mother testified that her most recent suicide attempt was in part a response to the twenty-four-hour-a-day foster care arrangement that made her feel as though she was not trusted. Id. at 334-35, 749 A.2d at 32. The arrangement mother relied upon to ensure proper care for G.C. was not working.
¶ 28. In this case, the court made no finding that there was a risk that, notwithstanding the agreement with DCF and the *328 child’s step-grandmother, mother would attempt to remove the child from the home. In fact, in contrast to In re G.C., where the mother who posed a risk to the child lived in the same home as the child, in this case mother’s contact with the child was limited to supervised visits. Moreover, this was not a disposition hearing in which mother sought custody of the child. Mother’s ability to care for this child (or father’s for that matter) was only relevant in the context of a hypothetical scenario that the court did not find was actually likely to arise. The threshold question for CHINS B purposes was whether this child was without proper parental care, and the trial court made no findings to support a determination that he was.
¶ 29. I do not mean to suggest that step-grandmother is forever doomed to continue caring for this child without formal legal authority. Mother could agree to a guardianship or even adoption wholly apart from any formal state intervention. Step-grandmother could indicate an unwillingness to continue to care for the child under the current terms — thereby potentially triggering either a CHINS B proceeding as projected by DCF if mother seeks to take the child back or a CHINS A proceeding if she declines to do so. But I do conclude that given the trial court’s findings as to the existing circumstances, its CHINS conclusion is not warranted under either potential prong of the CHINS statute.

 Forum on Child & Family Statistics, America’s Children in Brief: Key National Indicators of Well-Being, 2016 tbl. FAM1.A [hereinafter America’s Children] (providing table on “Family Structure and Children’s Living Arrangements: Percentage of Children Ages 0-17 by Presence of Parents in Household and Race *322 and Hispanic Origin, 1980-2015”), http://www.childstats.gov/americaschildren/ index.asp [http://penna.cc/QY6K-CHZP].

 Id. tbl. FAM1.B (providing table on “Family Structure and Children’s Living Arrangements: Detailed Living Arrangements of Children by Gender, Race and Hispanic Origin, Age, Parent’s Education, and Poverty Status, 2015”); see also id. fig. FAM1.B (providing figure on “Percentage of Children Ages 0-17 Living in Various Family Arrangements, 2015,” reflecting proportions of various arrangements among children who live in homes without legal parents).

 The majority rightly does not suggest that the trial court’s findings could support a conclusion that the child’s parents failed to make safe and appropriate arrangements for the child’s care or that the child’s care provider is unwilling or unable to provide care or support for the child and the whereabouts of the parents are unknown. See 33 V.S.A. § 5102(3)(A). The court’s findings could not support either of these conclusions.